CHRISTIAN CIVIC ACTION COMMITTEE and Barry King
*v.* W.J. "Bill" McCUEN, in his Official Capacity
as Secretary of State of the State of Arkansas

94-881                                                884 S.W.2d 605

Supreme Court of Arkansas
Opinion delivered October 14, 1994
[Rehearing denied October 24, 1994.*]

*Dudley and Hayes, JJ., would grant rehearing.

242

*Williams & Anderson*, by: *Leon Holmes*, for petitioners.

*Winston Bryant*, Att'y Gen., by: *M. Wade Hodge*, Asst. Att'y Gen., for respondent.

*Friday, Eldredge & Clark*, by: *Paul B. Benham* and *Allison Graves* and *Wright, Lindsey & Jennings*, by: *Alston Jennings*, for intervenors.

JACK HOLT, JR., Chief Justice. The present petition, an original action under Amendment 7 to the Arkansas Constitution, was filed in this court by petitioners Christian Civic Action Committee and Barry King. They request that we enjoin respondent Secretary of State W.J. "Bill" McCuen from placing proposed Amendment 4 on the ballot for the general election of November 8, 1994.

Although it is too late, as a practical matter, to prevent the proposed amendment from being added to the ballot, we hold that the ballot title, as designed, fails to convey an intelligible idea of the scope and import of proposed Amendment 4 and that the lengthy text is, under the precedents to which we have long adhered, misleading and tinged with partisan coloring. Thus, it is necessary that we grant the petition and declare the measure ineligible for consideration at the November 8, 1994, general election. We therefore enjoin the Secretary of State from canvassing and certifying the returns on Amendment 4.

Proposed Amendment 4 to the State Constitution bears the popular name:

> AN AMENDMENT TO AUTHORIZE A STATE LOT-TERY, NONPROFIT BINGO, PARI-MUTUEL WAGER-ING, AND ADDITIONAL GAMES OF CHANCE AT RACE TRACK SITES.

The petitioners do not question this popular name but instead challenge the sufficiency of the ballot title, the complete text of which is appended to this opinion.

Pursuant to Amendment 7, "[t]he sufficiency of all State-wide petitions shall be decided in the first instance by the Secretary of State, subject to review by the Supreme Court of the State,

which shall have original and exclusive jurisdiction over all such causes." The challenge to the sufficiency of the proposed amendment's ballot title is based on four grounds: (1) that the ballot title is too long to be read and comprehended during the time alloted the voter in the voting booth; (2) that the design of the ballot title will prevent the voter from comprehending that he or she is being asked to approve casino gambling and to grant a monopoly on for-profit gambling to the proposed amendment's backers; (3) that approval of the ballot title will undermine the integrity of the initiative process; and (4) that the use of the word "authorizing" in the ballot title is misleading. While the fourth issue has been argued by all parties, it is unnecessary, in light of our decision, to address the question of the asserted misleading use of the word "authorizing."

### Facts

By initiative petition pursuant to Amendment 7 to the Arkansas Constitution, proposed Amendment 4 was filed on July 5, 1994, with the Secretary of State, who certified it on July 27, 1994, to be placed on the ballot for the November 8, 1994, general election. It is undisputed that the proposed amendment was drafted at the behest of the owners of the Oaklawn race track in Hot Springs and the Southland race track in West Memphis.

On September 13, 1994, the Christian Civic Action Committee and Barry King, as petitioners, filed this original action, supported by briefs, for our review. Briefs in response from the Secretary of State and Craig Douglass, who was granted leave to appear as an intervenor on behalf of the Arkansas First Committee, were filed on September 26, 1994. The matter was argued before us on October 3, 1994.

### Ballot-title sufficiency: standard of review

■ Upon proper application for review, this court is entrusted with the duty and responsibility to ensure that, when voters exercise their right under Amendment 7 of the Arkansas Constitution to change a constitutional provision through the initiative process, they are allowed to make an intelligent choice, fully aware of the consequences of their vote. *Dust* v. *Riviere*, 277 Ark. 1, 638 S.W.2d 663 (1982).

■ Part of that duty and responsibility entails seeing that the individual voter has available a sufficient ballot title when deciding to accept or reject the amendment. *Id.* It has long been regarded as axiomatic that the majority of voters, when called upon to vote for or against a proposed measure at a general election, will derive their information about its contents from an inspection of the ballot title immediately before exercising the right of suffrage. *Id.; Hoban* v. *Hall*, 229 Ark. 416, 316 S.W.2d 185 (1958); *Westbrook* v. *McDonald*, 184 Ark. 741, 43 S.W.2d 356 (1931). This, indeed, is the purpose of the ballot title. *Dust* v. *Riviere, supra; Hoban* v. *Hall, supra.*

■ The general principles governing our determination of the sufficiency of particular ballot titles have been well articulated in *Bradley* v. *Hall*, 220 Ark. 925, 927, 251 S.W.2d 470, 471 (1952):

> On the one hand, it is not required that the ballot title contain a synopsis of the amendment or statute. . . . It is sufficient for the title to be complete enough to convey *an intelligible idea of the scope and import of the proposed law.* . . . We have recognized the impossibility of preparing a ballot title that would suit every one. . . . Yet, on the other hand, *the ballot title must be free from "any misleading tendency, whether of amplification, of omission, or of fallacy," and it must not be tinged with partisan coloring.* . . .

> It is evident that before determining the sufficiency of the present ballot title we must first ascertain what changes in the law would be brought about by the adoption of the proposed amendment. For the elector, in voting upon a constitutional amendment, is simply making a choice between retention of the existing law and the substitution of something new. It is the function of the ballot title to provide information concerning the choice that he is called upon to make. Hence *the adequacy of the title is directly related to the changes that he is given the opportunity of approving.*

(Emphasis added.)

The changes which would be wrought by proposed Amendment 4 will be reviewed in the context of the petitioners' argu-

ments. Ultimately, the central question to be resolved is whether, in the voting booth, the voter is able to reach an intelligent and informed decision for or against the proposal and to understand the consequences of his or her vote based on the ballot title itself. *See Dust* v. *Riviere, supra.*

■ Rightfully so, Amendment 7 places the burden of proof in legal challenges to initiative matters "upon the person or persons attacking the validity of the petition." We liberally construe Amendment 7 in determining the sufficiency of ballot titles. *Becker* v. *Riviere,* 270 Ark. 219, 604 S.W.2d 555 (1980). Our adoption of that approach, however, does not imply that liberality is boundless or that common sense is disregarded. *Dust* v. *Riviere, supra.*

### I. Length of ballot title

■ First, the petitioners contend that the ballot title in the present case is so lengthy that it cannot be read and comprehended within the time a voter is permitted to remain in the voting booth and, therefore, does not adequately inform the voter to enable him or her to make an intelligent choice for or against the amendment. We have held that a ballot title must not be unduly long because a voter is subject to statutory restrictions on the amount of time a voting booth may be occupied. *Gaines* v. *McCuen,* 296 Ark. 513, 758 S.W.2d 403 (1988). Here, the ballot title runs to 709 words in length and, as mentioned earlier, is reprinted in full for convenient reference in an appendix to this opinion.

■ Length, in itself, does not render a ballot title insufficient. In *Newton* v. *Hall,* 196 Ark. 930, 120 S.W.2d 364 (1938), for example, we held a 900-word ballot title (to the "Refunding Amendment"), which had been attacked for not providing enough detail, sufficient to apprise the voter of the contents of the proposal. Although the ballot title's length was not actually an issue as such, we observed that:

> The brevity of the ballot title here involved does not appear to be its chief fault. Rather, . . . its very length is a more serious objection. The elector could not read many such ballot titles within the five minutes he is allowed . . . "to occupy a booth or compartment for the purposes of voting."

196 Ark. at 948, 120 S.W.2d at 373.

■ The practical concern voiced in *Newton* was echoed in *Dust* v. *Riviere, supra*. There, in an opinion dealing with a challenge to the sufficiency of a 727-word ballot title (to "The Arkansas Utility Regulation Amendment"), we stated that:

> While neither the length nor the complexity of the ballot title should be a controlling factor, it is a consideration. . . . [C]ommon sense requires that we ask whether the average voter can make an intelligent considerate decision based on the ballot title. . . .
>
> We have concluded that the proposed ballot title is *so complex, detailed, lengthy, misleading and confusing that the Arkansas voter cannot intelligently make a choice based on the title.* The best evidence of that is the ballot title itself. We attach the ballot title as an addendum to this opinion and invite any disinterested person to read it in the time one would ordinarily use in a voting booth, and understand the changes that the amendment proposes.

(Emphasis added.) 277 Ark. at 6, 638 S.W.2d at 666. Clearly, other factors were involved in our decision to enjoin the Secretary of State from certifying the proposed Utility Regulation Amendment as valid. But, it must be noted, the special prominence accorded the ballot title's length obviously signaled our conviction that length can become a major, though not controlling, consideration in determining the sufficiency of a ballot title.

The appended ballot title in the present case, like the one in *Dust*, speaks eloquently for itself. On November 8, 1994, Arkansas electors will vote on other proposed amendments and choose between candidates for the United States House of Representatives, Governor of Arkansas, Attorney General of Arkansas, Secretary of State of Arkansas, and various other state and local offices. Under Ark. Code Ann. § 7-5-522(d) (Repl. 1993), "[n]o voter shall remain in the voting booth longer than five (5) minutes, if voters are waiting in line." It requires little imagination to foresee, under these statutory time constraints, the practical difficulty posed to the elector in the voting booth by a ballot title of such complexity and length.

■ Even so, we must emphasize that, standing alone, the present ballot title's insufficiency is not attributable to its length.

We are, however, troubled by the length in its relation to other critical factors — particularly, the strategic employment of abstract terminology to mask plain meaning and the tactical placement of key elements relating to for-profit gambling in the middle or near the end of the title's text, the combination of which is unacceptable.

## II. Terminology and information placement in ballot title

The petitioners argue, in their second point, that the design of the ballot title will prevent the voter from understanding that he or she is being asked to approve casino gambling and a monopoly for the proposed amendment's backers on for-profit gambling. Specifically, the petitioners point to five types of gambling that the proposal would authorize: (1) "a state lottery"; (2) "bingo games" conducted by licensed "non-profit, tax-exempt charitable, religious and civic organizations"; (3) "raffles" conducted by "non-profit, tax-exempt charitable, religious and civic organizations"; (4) "pari-mutuel wagering" conducted by "pari-mutuel franchisees" in Garland and Crittenden Counties; and (5) "additional racetrack wagering" conducted by "pari-mutuel franchisees" in Garland and Crittenden Counties.

As the petitioners note, the first four forms of gambling named in the ballot title appear under common appellations that have a more-or-less general currency among the public. Each term is defined in the proposed amendment. It can be assumed that most voters will readily understand what a state lottery, a charitable bingo game, and a charitable raffle entail; a more limited number of voters, *i.e.*, those who are familiar with horse or dog racing (long established in this state), will have little difficulty with the term "pari-mutuel wagering." But "additional racetrack wagering" summons up, if anything, images of alternative methods of "playing the horses" or "running the dogs" — not casino-style gambling.

The term "additional racetrack wagering" is defined in the ballot title as "wagering on games of chance or skill conducted by mechanical, electrical, electronic or electromechanical devices and table games." So hypertechnical a description, occurring midway through the long ballot title, offers little in the way of immediate enlightenment. It is more than a bit disingenuous on the

part of the intervenor to counter that "[t]he ballot title defines 'additional racetrack wagering' exactly as the Amendment defines it." Unless, on entering the voting booth, a voter possesses a ready frame of reference, it is unlikely that he or she will be able to translate the jargon within a reasonable amount of time into such relatively familiar concepts as video poker, slot machines, roulette wheels, blackjack, craps, poker, and other games of chance unrelated to betting on horses or dogs.

It is evident, as the petitioners suggest, that "additional racetrack wagering" is a euphemism and, further, that the definition consists of compounded euphemisms designed to cloak in semantic obscurity the actual nature of the proposed enterprise. What, in fact, the definition obliquely describes in highly technical terms are the elements of casino-style gambling. Yet voters favoring or opposing the inauguration of casino-style gambling may well be unaware that this is precisely what Amendment 4 seeks to accomplish.

Simply put, neither the term "additional racetrack gambling" nor its definition provides sufficient information to the voter. Moreover, in this context, "additional racetrack gambling" is impermissibly tinged with partisan coloring as it gives the voter only the impression that the proponents of the proposed amendment wish to convey of the activity represented by the words. *See Arkansas Women's Political Caucus* v. *Riviere*, 283 Ark. 463, 677 S.W.2d 846 (1984); *Bradley* v. *Hall, supra.*

In both the ballot title and Section 2 ("Activities Authorized") of the proposed amendment, the drafters scrupulously avoided the use of commonly understood terms such as "casinos" and "gambling houses" in connection with the enterprises to be established at the racetracks in Hot Springs and West Memphis, employing instead the abstract, euphemistic "additional racetrack wagering." They nevertheless took care in Section 3 of the proposed amendment to spell out the "Activities Prohibited" in plain, concrete English:

> All wagering activities, including but not limited to, lotteries, casinos, gambling houses, gambling operations and other gambling and gaming activities, other than those activities authorized in Section 2 of this Amendment [*i.e.*,

the Arkansas State Lottery, bingo games, raffles, pari-mutuel wagering at the Oaklawn and Southland racetracks, and "additional racetrack wagering" at the Oaklawn and Southland racetracks], are prohibited and shall not be authorized by this State.

Yet "additional racetrack wagering" and "casinos" embrace the same activities — roulette, blackjack, poker, and so forth. Indeed, counsel for intervenor Douglass acknowledged as much at oral argument.

Contrary to Justice Glaze's dissent, we have made it clear that the absence of the word "casino" is not the gravamen of this decision. It is the description of the additional gambling in conjunction with the term "racetrack" that is misleading and that suggests something other than casino gambling is at issue. That, of course, is not the case. What is at issue here is not merely "racetrack" gambling but a wholly new and expanded category of gambling associated with casinos.

Viewing in the context of the ballot title's considerable length the specialized terminology, which obscures meaning, and the artful amplifications and omissions, which conceal the proposed amendment's potential effect, we must hold that the ballot title manifests a fatal misleading tendency. *See Dust v. Riviere, supra.*

### III. Integrity of the initiative process

Amendment 7's reservation to the people of the initiative power lies at the heart of our democratic institutions. A ballot title must, as we have stated, convey an intelligible idea of the scope and significance of a proposed change in the law. *See Bradley v. Hall, supra.* Amendment 4's ballot title does not. Therefore, it cannot stand. In order to uphold the integrity of the initiative process, we must declare the proposed amendment ineligible for consideration at the general election on November 8, 1994. *See Arkansas Women's Political Caucus v. Riviere, supra.* The Secretary of State is hereby enjoined from canvassing and certifying any returns on the measure. *See* Ark. Code Ann. § 7-9-120(c) (Repl. 1993).

Petition granted, and the mandate is ordered issued within

five days unless a petition for rehearing is filed. If a petition for rehearing is filed, briefing will be on an expedited basis to be set by the clerk.

DUDLEY, HAYS, and GLAZE, JJ., dissent.

*ADDENDUM*

The following is the complete text of the ballot title of proposed Amendment 4:

A PROPOSED AMENDMENT TO THE ARKANSAS CONSTITUTION AUTHORIZING ARKANSAS TO ESTABLISH A STATE LOTTERY, TO BE CONDUCTED BY THE STATE OR BY THE STATE IN CONJUNCTION WITH LOTTERIES IN OTHER STATES; CREATING A FIVE-MEMBER STATE LOTTERY COMMISSION APPOINTED BY THE GOVERNOR TO ADMINISTER THE LOTTERY; PRESCRIBING THE QUALIFICATIONS AND TERMS OF OFFICE OF COMMISSION MEMBERS AND THE POWERS AND DUTIES OF THE COMMIS-SION; AUTHORIZING THE GOVERNOR TO REMOVE MEMBERS OF THE COMMISSION FOR CAUSE; REQUIRING THE GOVERNOR TO APPOINT AN EXEC-UTIVE DIRECTOR OF THE STATE LOTTERY TO MAN-AGE THE OPERATION OF THE LOTTERY UNDER THE COMMISSION'S SUPERVISION; REQUIRING THE COMMISSION TO ALLOCATE THE TOTAL ANNUAL REVENUES FROM SALES OF LOTTERY TICKETS AS NEAR AS REASONABLY PRACTICAL AS FOLLOWS: 50% TO PRIZES, 34% TO REVENUES RETURNED TO THE PUBLIC TO BENEFIT CRIME PREVENTION AND PUBLIC SCHOOLS THROUGH APPROPRIATIONS BY THE GENERAL ASSEMBLY, 11% TO THE EXPENSES OF OPERATING THE STATE LOTTERY, AND 5% TO COMMISSION ON TICKET SALES; PROHIBITING THE IMPOSITION OF STATE OR LOCAL TAXES UPON THE SALE OF LOTTERY TICKETS; AUTHORIZING NON-PROFIT, TAX-EXEMPT CHARITABLE, RELIGIOUS AND CIVIC ORGANIZATIONS WHICH HAVE BEEN LICENSED BY THE STATE TO CONDUCT BINGO GAMES AND RAFFLES; PRESCRIBING THE QUALI-

FICATIONS OF THE PERSONS AND ORGANIZATIONS CONDUCTING BINGO GAMES OR RAFFLES; LIMITING THE ALLOWABLE EXPENSES AND COMPENSATION ASSOCIATED WITH A BINGO GAME OR RAFFLE; REQUIRING ALL NET RECEIPTS OVER AND ABOVE THE ACTUAL COST OF CONDUCTING A BINGO GAME OR RAFFLE TO BE USED FOR CHARITABLE, RELIGIOUS OR PHILANTHROPIC PURPOSES; AUTHORIZING A PARI-MUTUEL FRANCHISEE TO CONDUCT PARI-MUTUEL WAGERING, INCLUDING SIMULCASTING AND MERGED-POOL WAGERING, ON HORSES IN GARLAND COUNTY, ARKANSAS, AND A PARI-MUTUEL FRANCHISEE TO CONDUCT PARI-MUTUEL WAGERING, INCLUDING SIMULCASTING AND MERGED-POOL WAGERING, ON GREYHOUNDS IN CRITTENDEN COUNTY, ARKANSAS; PROVIDING THAT HORSE RACING AND GREYHOUND RACING AND PARI-MUTUEL WAGERING THEREON SHALL NOT CONSTITUTE A LOTTERY AND SHALL BE REGULATED BY THE GENERAL ASSEMBLY; AUTHORIZING PARI-MUTUEL FRANCHISEES TO CONDUCT ADDITIONAL WAGERING ON OR ADJACENT TO THE SITES WHERE HORSE RACING IS CONDUCTED IN GARLAND COUNTY, ARKANSAS, AND WHERE GREYHOUND RACING IS CONDUCTED IN CRITTENDEN COUNTY, ARKANSAS; DEFINING THIS "ADDITIONAL RACETRACK WAGERING" AS WAGERING ON GAMES OF CHANCE OR SKILL CONDUCTED BY MECHANICAL, ELECTRICAL, ELECTRONIC OR ELECTROMECHANICAL DEVICES AND TABLE GAMES; PROVIDING THAT THIS ADDITIONAL RACETRACK WAGERING SHALL NOT BE LIMITED TO WHEN RACING IS BEING CONDUCTED AND SHALL NOT CONSTITUTE A LOTTERY; RENAMING THE ARKANSAS RACING COMMISSION THE ARKANSAS RACING AND WAGERING COMMISSION; EXPANDING THE COMMISSION BY TWO MEMBERS TO BE APPOINTED BY THE GOVERNOR AND SETTING THEIR TERMS OF OFFICE; AUTHORIZING THE COMMISSION TO REGULATE THE ADDITIONAL RACE-

TRACK WAGERING; PERMITTING ONLY TYPES OF WAGERING REQUESTED BY THE PARI-MUTUEL FRANCHISEE AND APPROVED BY THE COMMISSION; REQUIRING THE COMMISSION TO ADOPT EMERGENCY REGULATIONS BEFORE JANUARY 1, 1995 SO THE ADDITIONAL RACETRACK WAGERING MAY BEGIN AT THAT TIME; ESTABLISHING A TAX ON NET ADDITIONAL RACETRACK WAGERING REVENUES EQUAL TO 8% TO BE PAID TO THE STATE, 1/2 OF 1% TO BE PAID TO THE COUNTY IN WHICH THE PARI-MUTUEL FRANCHISEE IS OPERATING, AND 1% TO BE PAID TO THE CITY IN WHICH THE PARI-MUTUEL FRANCHISEE IS OPERATING; AUTHORIZING THE GENERAL ASSEMBLY TO AMEND SUCH TAX RATES BY THREE-FOURTHS VOTE OF EACH HOUSE; DEDICATING 20% OF THE TAXES PAID TO THE STATE TO THE ARKANSAS DEPARTMENT OF PARKS AND TOURISM AND THE ARKANSAS INDUSTRIAL DEVELOPMENT COMMISSION; PROHIBITING THE LEVY OF OTHER TAXES OR FEES ON ADDITIONAL RACETRACK WAGERING OR ON A PARI-MUTUEL FRANCHISEE WITH RESPECT TO ITS ADDITIONAL RACETRACK WAGERING ACTIVITIES; REQUIRING THE GENERAL ASSEMBLY TO DETERMINE THE TAX ON PARI-MUTUEL WAGERING INVOLVING HORSE RACING OR GREYHOUND RACING; DECLARING THE PROVISIONS OF THE AMENDMENT PERTAINING TO ADDITIONAL RACETRACK WAGERING TO BE SELF-EXECUTING; AUTHORIZING OTHER WAGERING ACTIVITIES APPROVED BY THE VOTERS AT THE GENERAL ELECTION OF NOVEMBER 8, 1994 IN A SEPARATE AMENDMENT OR AMENDMENTS TO THE CONSTITUTION; PROHIBITING ALL WAGERING ACTIVITIES OTHER THAN THOSE AUTHORIZED BY THIS AMENDMENT; DEFINING CERTAIN TERMS USED IN THE AMENDMENT; AUTHORIZING THE GENERAL ASSEMBLY TO IMPLEMENT THE AMENDMENT WITH RESPECT TO THE STATE LOTTERY, BINGO AND RAFFLES; REPEALING ALL CONSTITUTIONAL PROVISIONS AND LAWS TO THE EXTENT THEY CONFLICT WITH

THE AMENDMENT; RENDERING THE PROVISIONS OF THE AMENDMENT SEVERABLE; DECLARING THE AMENDMENT OPERATIVE UPON APPROVAL BY THE VOTERS.

ROBERT H. DUDLEY, Justice, dissenting. The petitioners, Christian Civic Action Committee and Barry King, filed this original action in this court seeking to restrain the Secretary of State from certifying the election results of a proposed constitutional amendment entitled, "An amendment to authorize a state lottery, nonprofit bingo, pari-mutuel wagering and additional games of chance at racetrack sites." The majority opinion holds that the ballot title is misleading and enjoins the Secretary of State from certifying the results of the election. I respectfully dissent.

## I.

### A. STATE CONSTITUTIONAL AND STATUTORY PROVISIONS CONCERNING GAMBLING

In order to determine if a ballot title is sufficient, this court must determine what changes in the law the proposal would make. *Moore* v. *Hall*, 229 Ark. 411, 316 S.W.2d 207 (1958). The Constitution of Arkansas provides: "No lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed." Ark. Const. art. 19, § 14. The identical provision was contained in the statehood constitution of 1836, the secession constitution of 1861, the military constitution of 1864, the reconstruction constitution of 1868, and the current constitution of 1878. The reason for the provision in all five constitutions is that lotteries, which are of ancient origin, had became so common and their influence had become so pernicious that they were singled out and treated differently from other forms of gambling. Since statehood, they continually have been constitutionally prohibited. As a result, the legislature has not been able to authorize lotteries.

A lottery is defined as a game that is determined entirely by lot, or mere luck, and in which judgment, practice, or skill are to no avail. "[T]o constitute a lottery it is essential not only that the element of chance is present, but also that it controls and determines the award of the prize, whatever it may be." *Longstreth* v. *Cook*, 215 Ark. 72, 80, 220 S.W.2d 433, 437 (1949).

The constitutional section prohibiting lotteries does not operate as a blanket prohibition against gambling. It forbids only the legislative legalization of lotteries and the sale of lottery tickets. *Scott* v. *Dunaway*, 228 Ark. 943, 311 S.W.2d 305 (1958). Thus, the legislature can authorize forms of gambling other than a lottery.

In 1838, the general assembly made illegal many forms of gambling. Many of the revised statutes of 1838 prohibiting various forms of gambling are brought forward in today's statutes. *See* Ark. Code Ann. §§ 5-66-101—5-66-119 (Repl. 1993). The public policy against gambling, expressed by the legislature in 1838, was so strong that a losing bettor was authorized to file suit to recover his losses, but a winning bettor was prohibited from filing suit to collect his winnings. That public policy set by the general assembly is still in force. *See* Ark. Code Ann. § 16-118-103(a) & (b)(1) (1987).

While gambling in general was made illegal by the general assembly, horse racing occurred with some frequency. *See McLain* v. *Huffman*, 30 Ark. 428 (1875). Likely, it was for this reason that the revised statutes of 1838 provided that a losing bettor was authorized to maintain a suit to recover losses, except that no bettor could recover money "lost on any turf race." Ark. Code Ann. § 16-118-103(a)(3) (1987). Horse racing continued in various forms, and, in 1935, the general assembly legalized pari-mutuel betting on horse races. 1935 Ark. Acts 46 § 14. A suit was filed to determine whether Act 46 violated the constitutional provision against lotteries. This court held that pari-mutuel betting on a horse race was not determined by chance alone and therefore did not come within the constitutional prohibition against lotteries. *Longstreth* v. *Cook*, 215 Ark. 72, 220 S.W.2d 433 (1949).

Sections 1 and 9 of Act 46 of 1935 provided for an Arkansas Racing Commission, and that the Commission could award franchises "to operate a race track and hold racing meetings in such counties of the State as the Commission may believe there will be applicants for franchises." However, section 22 of the Act provided that if a majority of the voters in any county voted against racing no franchise could be awarded in that county. The holder of the franchise in Garland County apparently did not wish its franchise to be subject to the vagaries of the electors of that

county. In November 1956, Amendment 46 to the Arkansas Constitution was passed by a vote of 219,835 to 161,630. It provides: "Horse racing and pari-mutuel wagering thereon shall be lawful in Hot Springs, Garland County, Arkansas, and shall be regulated by the General Assembly." For deciding the issue now before us, it matters not whether the action was wise or imprudent, rather it matters only that the citizens of the State elevated horse racing and pari-mutuel betting in Hot Springs to the same constitutional levels as the right to peaceably assemble, article 2, section 4, and the right to liberty of the press and of speech, article 2, section 6. From that time, neither the voters of Hot Springs nor the voters of Garland County nor the general assembly could stop horse racing and pari-mutuel betting in Hot Springs. It can now be stopped only by another amendment to the state constitution.

Current statutes provide that "horse racing may be conducted in all political subdivisions of the State" and the Arkansas Racing Commission is authorized to "grant franchises to conduct horse races" upon specified terms and conditions. Ark. Code Ann. §§ 23-110-204 & 23-110-301 (1987).

Act 339 of 1935 provided for pari-mutuel wagering on greyhound racing. The 1935 Act was replaced by the current "Arkansas Greyhound Racing Law" of 1957. *See* Ark. Code Ann. §§ 23-111-101—515 (1987 & Supp. 1993). Pari-mutuel wagering on greyhounds under this act does not violate the constitutional provision against lotteries. *Scott* v. *Dunaway*, 228 Ark. 943, 311 S.W.2d 305 (1958). The general assembly currently has the authority to repeal the act providing for pari-mutuel wagering on greyhound racing, and the qualified electors of any county in which a greyhound racing franchise is located can void a franchise. Ark. Code Ann. § 23-111-306(c) (1987).

## B. PROVISIONS OF THE PROPOSED AMENDMENT

The text of the proposed amendment would repeal the long-standing prohibition of lotteries. It would amend the constitution to provide that bingo and raffles, games based entirely on chance, are authorized. It would authorize pari-mutuel wagering at a horse racing franchise in Garland County and at a greyhound racing franchise in Crittenden County and thus take away the right of the voters of Crittenden County to stop greyhound rac-

ing. It would authorize additional games of chance at the two racetrack sites. It would prohibit any gambling not provided for in the amendment and thus would prohibit the opening of other racetracks.

## II.

### STANDARDS FOR DETERMINING THIS SUIT

The gravamen of petitioners' complaint is that the vote should not be certified because the ballot title does not convey the true scope and the significance of the proposal and, in addition, is misleading.

An adequate ballot title is one that impartially discloses all material matters. It must be (1) intelligible, (2) honest, and (3) impartial. *Leigh* v. *Hall*, 232 Ark. 558, 562, 339 S.W.2d 104, 107 (1960).

There is a distinction between the omission of a material matter and a misleading statement in ballot titles. It is not necessary to disclose all provisions of the text of the proposal in the ballot title; otherwise, the full text of the proposal would be necessary. *Gaines* v. *McCuen*, 296 Ark. 513, 758 S.W.2d 403 (1988). However, it is necessary to disclose all material issues. A material issue is one that would give a voter "serious ground for reflection" in deciding whether to vote for or against a proposal. *Hoban* v. *Hall*, 229 Ark. 416, 418, 316 S.W.2d 185, 186 (1958). The omission of a material issue from a ballot title can cause this court to strike the proposed issue. *See Walton* v. *McDonald*, 192 Ark. 1155, 97 S.W.2d 81 (1936). The reason is that the omission of a material issue can prevent disclosure of the scope and import of the proposed measure.

While we must determine whether an omission amounts to a material omission, we do not do so when the ballot title is misleading. We have said that a ballot title ought to be "free from any misleading tendency" and "contain no partisan coloring." *Shepard* v. *McDonald*, 189 Ark. 29, 30, 70 S.W.2d 566, 566 (1934) (quoting *Westbrook* v. *McDonald*, 184 Ark. 740, 43 S.W.2d 356 (1931)). Every ballot title must be "honest." *Plugge* v. *McCuen*, 310 Ark. 654, 657, 841 S.W.2d 139, 140 (1992). The ballot title must present the voter "with a fair understanding" of

the issue presented. *Ferstl* v. *McCuen*, 296 Ark. 504, 509, 758 S.W.2d 398, 400 (1988).

In summary, the ballot title must accurately and honestly disclose the text of the proposal so that the public might make an informed choice.

We have also said that the Attorney General's approval of a ballot title raises a presumption that it is sufficient, and only in a clear case should his approval be held insufficient. *Plugge*, 310 Ark. at 657, 841 S.W.2d at 140 (citing *see Fletcher* v. *Bryant*, 243 Ark. 864, 422 S.W.2d 698 (1968)). However, the Initiative and Referendum Amendment makes no mention of the review of a ballot title by the Attorney General, and it does not speak of a presumption. Also, in *Fletcher* the court merely stated that since the general assembly had enacted enabling legislation providing for review by the Attorney General, *see* Ark. Code Ann. § 7-9-107 (1987), there "is a clear implication that the general assembly intended that presumptions as to sufficiency of a ballot title approved by the Attorney General favor the sponsors of a referendum petition inasmuch as the act specifically provides for relief to them, but not opponents, by petition to this court." *Fletcher*, 243 Ark. at 869, 422 S.W.2d at 701-02; but see *Gaines*, 296 Ark. at 519, 758 S.W.2d at 406.

The issue then is whether this court should afford the Attorney General a province of authority that is not contained in the constitution. It should not.

All power inheres in the people, but the people may not exercise all power. The will of the majority must prevail, but only if it is within the balances and limitations of the Constitution. The majority is a true sovereign, but only when held in check by those balances and limitations. It is a dualism that is institutionalized in our constitutional structure, for as the American Constitution was the first in history to incorporate the principle that men make government and that all government derives its authority from consent, it was also the first to place effective limits on government. *See*, Henry Steele Commager, *Commager On Tocqueville* 21-22 (1993).

This paradox inherent in our democracy is carried an additional step in our system of federalism. The people of a state are

to be governed by the will of the majority, but that will is held in check by balances and limitations of both the United States and the state constitutions. While article 2, section 1 of the Arkansas Constitution provides that "[a]ll political power is inherent in the people and government [and] is instituted for their protection, security and benefit; and they have the right to alter, reform or abolish the same in such manner as they may think proper," the provision is limited by both constitutions.

Under our system of federalism the Supreme Court of the United States gives the ultimate construction of the Constitution of the United States, and the state supreme courts give the ultimate construction of state constitutions on matters of state law. At times the courts must take anti-majority positions to uphold the constitution at issue. This is the foundation of the just rule by the majority. In ballot title cases that profound responsibility cannot be shifted by the general assembly, and it cannot be passed to the Attorney General. It is basic that the responsibility is wholly in the judiciary. The only question then is one of law, and it is does the ballot title fall within or without the standards by the constitution?

## III.

### APPLYING THE STANDARD IN THIS CASE

The petitioners do not question the sufficiency of the ballot title description of the first three proposed categories of gambling, which include a lottery, bingo games, and raffles. The argument is over the sufficiency, scope, and fairness of the fourth and fifth categories of gambling authorized. The majority opinion seems to question the sufficiency of the fourth category and holds the fifth category manifests a fatal misleading tendency.

### A. THE FOURTH CATEGORY — PARI-MUTUEL WAGERING IN GARLAND AND CRITTENDEN COUNTY

The ballot title describes the fourth category of gambling, pari-mutuel wagering on horse racing and greyhound racing, as follows:

> Authorizing a pari-mutuel franchisee to conduct pari-mutuel wagering, including simulcasting and merged-pool wager-

ing, on horses in Garland County, Arkansas, and a pari-mutuel franchisee to conduct pari-mutuel wagering, including simulcasting and merged-pool wagering, on greyhounds in Crittenden County, Arkansas; providing that horse racing and greyhound racing wagering thereon shall not constitute a lottery and shall be regulated by the General Assembly.

The language provides that the amendment would authorize one franchise for pari-mutuel betting on horse racing in Garland County and one franchise for pari-mutuel betting on greyhound racing in Crittenden County, with pari-mutuel betting taking place at both racetracks.

The less obvious, but equally important, question is whether the ballot title informs the voters that the proposed amendment would repeal current laws so that neither the general assembly nor the Racing Commission could authorize a franchise for horse racing in a county other than Garland, nor could the legislature or the Commission authorize a franchise for greyhound racing in a county other than Crittenden. Also of concern is whether the ballot title informs the voters that the citizens of Crittenden County would no longer be able to stop greyhound racing in that county. The ballot title provides that it is an amendment "[p]rohibiting all wagering activities other than those authorized by this amendment" and is an amendment "[r]epealing all constitutional provisions and laws to the extent they conflict with the amendment." The language informs the voter that the proposal would grant an exclusive license to the holders of the two racetrack franchises, and anything to the contrary would be repealed. As a result, it comes within the standard for an initiated provision.

The majority opinion does not hold to the contrary, but questions the fact that there is no express disclosure that the citizens of Crittenden County could no longer vote to stop greyhound racing. It is not necessary for the ballot title to discuss in detail the law repealed. While we must first determine the changes a proposal would make before determining the sufficiency of a petition, there is no requirement that those changes be specifically set out in the ballot title. *Moore* v. *Hall*, 229 Ark. 411, 316 S.W.2d 207 (1958).

## B. THE FIFTH CATEGORY — ADDITIONAL WAGERING AT THE TWO EXCLUSIVE FRANCHISES

Petitioners' principal argument is that the ballot title is misleading because the voter is being asked to approve casino-style gambling, but the word "casino" does not appear in the section defining authorized activities. The majority opinion embraces this argument. The question of law is whether the ballot title adequately informs the voter that he or she is being asked to approve the various kinds of gambling that are proposed to take place at the two exclusive franchises.

Contrary to the holding of the majority opinion, the popular name of the proposal suggests the correct answer to the issue. It is, "An amendment to authorize a state lottery, nonprofit bingo, *pari-mutuel wagering and additional games of chance at racetrack sites.*" (Emphasis added.)

The ballot title states that the proposal is an amendment: "Authorizing pari-mutuel franchisees to conduct additional wagering on or adjacent to the sites where horse racing is conducted in Garland County, Arkansas, and where greyhound racing is conducted in Crittenden County, Arkansas." The language plainly states that the wagering authorized, in addition to the pari-mutuel wagering, would take place in either some part of the existing racetrack facilities, or in some facility adjacent to the racetrack sites. A "casino" is defined in Webster's International Dictionary as "1. a small country house. 2. a building or room used for social meetings, or public amusements, for dancing, gaming, etc." *Webster's International Dictionary*, 416 (2d ed. 1953). It is defined in Webster's Third New International Dictionary as "1. a building or room used for social meetings and public amusement (as dancing; (specif.); a building or room for gambling." *Webster's New International Dictionary*, 347 (3d ed. 1961). In the context of a building or room, the ballot title provides all the information that the word "casino" would provide. That is, some part of the currently existing buildings at the racetracks or some building or room adjacent to the current facilities would be used for gambling. The language sufficiently apprises the voter of the location, scope, and extent of the buildings proposed to be used for the "additional wagering."

The majority opinion, however, states that the voter will not be informed that the buildings will contain such games as "video poker, slot machines, roulette wheels, blackjack, craps, poker, and other games of chance" are proposed for the buildings located at or adjacent to the current facilities. The rhetoric of the majority opinion ignores the plain language of the ballot title. The ballot title plainly states that the two holders of the two race track franchises would be authorized to "conduct additional wagering." It then defines this "additional racetrack wagering" as "wagering on games of chance or skill conducted by mechanical, electrical, electronic or electromechanical devices and table games; providing that this additional racetrack wagering shall not be limited to when racing is being conducted and shall not constitute a lottery."

The majority opinion holds that the phrase "additional racetrack wagering" is misleading partisan coloring that should void the proposal. The argument might well be valid if "additional racetrack wagering" stood alone and was not defined, but the phrase is defined as wagering on games of chance or skill and table games whether conducted electrically, mechanically, or electromechanically at the racetrack sites. Such a definition informs the voter that gambling on various games of chance or skill is proposed for each of the two locations. It is not necessary that the specific games of chance be specified. In summary, the fifth category of gambling, wagering on games of chance at the race tracks, in addition to pari-mutuel betting on races, meets the requirements for a ballot title.

The majority opinion also holds that the sequence the information is placed in the ballot title prevents the voter from understanding the issue. The ballot title follows the order of the text of the amendment. That is how it should be. The majority opinion cites no authority to the contrary.

## IV.

## CONCLUSION

The ballot title accurately discloses that the proposed amendment would amend the present constitution to authorize five forms of gambling. It discloses that pari-mutuel betting at two race track sites, one to be located in Garland County and the other in

Crittenden County, would be authorized through exclusive state franchises. It discloses that additional games of chance or skill would be authorized at the sites of the two racetracks. Proposals submitted under the Initiative and Referendum Amendment are to be "construed with some degree of liberality in order that its purposes may be well effectuated." *Leigh* v. *Hall*, 232 Ark. 558, 566, 339 S.W.2d 104, 109 (1960) (quoting *Reeves* v. *Smith*, 190 Ark. 213, 215, 78 S.W. 72, 73 (1935)). Yet, the majority opinion holds that the ballot title is so misleading that it cannot be understood by the voter. I respectfully dissent from that holding.

TOM GLAZE, Justice, dissenting. In constitutional cases dealing with what is obscenity, it has been said that obscenity is in the eyes of the beholder. Well, it can also be said that what might or might not be confusing on a General Election ballot to an Arkansas voter is determined solely through the eyes of four members of this court. In making that determination, this court may wrongly assume the average Arkansas voter is not capable of reading, studying and understanding a proposed constitutional measure and making an intelligent choice when called on to vote on that constitutional issue. That erroneous assumption, I submit, was utilized here in reviewing initiated Amendment 4. Contrary to the majority members' view, I believe the Arkansas electorate is fully capable of sorting through the petitions, popular names, ballot titles and the text of the proposed measures and intelligently vote for or against proposed Amendment 4. In addition to these aids, voters are educated through personal contact and the media by special interests respecting opposing sides of this controversial amendment. Voters are further informed of the content and substance of initiated amendments when such proposed amendments are published, and on the day of the election, are posted on the walls of every polling precinct in the state. Ark. Code Ann. §§ 7-5-206, 7-5-301 and 7-9-113 (Repl. 1993).

Arkansas law very clearly supports the idea that Arkansas citizens intended to reserve to themselves the power to propose legislative measures, laws and constitutional amendments independent of the General Assembly. *See* Amendment 7 to the Arkansas Constitution. When this court is asked to remove from the ballot an amendment proposed by citizens exercising the constitutional power reserved them, it should do so cautiously and with great trepidation.

The majority is correct that a ballot title must be free from any misleading tendency, whether by amplification, omission or fallacy. However, no such amplification, omission or fallacy exists in the case here. Although the majority opinion seems intent on wanting to insert new or different wording for that already employed in the ballot title, the opinion, while stating otherwise, points to no actual words of amplification or exaggeration. Nor does the opinion say that the ballot title omitted something material that appears in the amendment. To the contrary, the majority opinion says the ballot title is too lengthy; plainly, it covers the entire subject matter contained in Amendment 4 and omits nothing of substance. In fact, of the several ballot titles submitted to this court for review this 1994 General Election year, the one before us in this case is the most comprehensive in covering the content of its proposed initiative measure.

As to whether a fallacy exists, the majority seizes on language midway in the ballot which provides as follows:

> . . . AUTHORIZING *A PARI-MUTUEL FRANCHISEE* TO CONDUCT PARI-MUTUEL WAGERING, INCLUDING SIMULCASTING AND MERGED-POOL WAGERING, ON HORSES *IN GARLAND COUNTY*, ARKANSAS *AND A PARI-MUTUEL FRANCHISEE* TO CONDUCT PARI-MUTUEL WAGERING, INCLUDING SIMULCASTING AND MERGED-POOL WAGERING, ON GREYHOUNDS *IN CRITTENDEN COUNTY*, ARKANSAS; PROVIDING THAT HORSE RACING AND GREYHOUND RACING AND PARI-MUTUEL WAGERING THEREON SHALL NOT CONSTITUTE A LOTTERY AND SHALL BE REGULATED BY THE GENERAL ASSEMBLY; *AUTHORIZING PARI-MUTUEL FRANCHISEES TO CONDUCT ADDITIONAL WAGERING ON OR ADJACENT TO THE SITES WHERE HORSE RACING IS CONDUCTED IN GARLAND COUNTY, ARKANSAS, AND WHERE GREYHOUND RACING IS CONDUCTED IN CRITTENDEN COUNTY, ARKANSAS; DEFINING THIS "ADDITIONAL RACETRACK WAGERING" AS WAGERING ON GAMES OF CHANCE OR SKILL CONDUCTED BY MECHANICAL, ELECTRICAL, ELECTRONIC OR ELECTRO-MECHANICAL DEVICES AND TABLE GAMES* . . .
> (Emphasis added).

After quoting from the above, the majority concludes the Arkansas voter simply cannot read the proposal's definitional language, "wagering on games of chance or skill conducted by mechanical, electrical, electronic or electromechanical devices and table games," and understand casino gambling is allowed under the amendment. Arkansas voters should be insulted by the majority court's low estimation of their intelligence. After all, what are electronic or mechanical devices and table games if they are not casino gambling paraphernalia? The majority is being extremely strict and technical in stating the word "casino" must appear somewhere in the ballot title or the voters will not understand the issue they are voting on. It is well-settled that this court is to liberally construe Arkansas's law when reviewing the sufficiency of a ballot title — not nit-pick it to pieces.

The majority opinion altogether discards another "word argument" made by petitioner. Specifically, the majority fails to discuss petitioner's argument that the word "monopoly" is improperly absent from the ballot title, since the effect of the proposed amendment is to sanction a monopoly for the owners of Oaklawn and Southland racetracks. Suffice it to say, Arkansas voters, in my view, can read the ballot title and understand that Arkansas's only two existing pari-mutuel franchises, Oaklawn and Southland racetracks, will continue as such upon Amendment 4's adoption. The ballot title mentions "the pari-mutuel franchisee in Garland County and the pari-mutuel franchisee in Crittenden County," thereby identifying the entities who will benefit from the proposed amendment's passage. I suggest that a person would have to be Rip Van Winkle not to know that only two pari-mutuel franchises exist in Arkansas and that they are commonly known as Oaklawn and Southland. Arkansas law has authorized only these two pari-mutuel franchises for decades and the proposed amendment would continue past practice. The Arkansas people are well aware of these two pari-mutuel franchises, and their control of racetrack wagering in this state. Whether authorized by constitutional amendment or by statute, the present two race track franchises have had, now have and would continue to have, under the proposed amendment an exclusive franchise in wagering in this state.

It is worthwhile to mention that the majority court also fails to discuss another "word argument" urged by petitioner, namely,

the use of the word "authorize" in the ballot title is misleading because "authorize" indicates the state may grant permission for a lottery when the measure actually mandates a lottery. Petitioners add that the use of the word "authorize" also suggests new power is given to the legislature to permit pari-mutuel wagering when, in fact, the legislature is already authorized to permit such wagering. Obviously, the majority saw no merit in these arguments, and I would agree.

The majority court, reduced to its sole point that the word "casino" is not mentioned in the ballot title, attempts to shore up its decision to remove Amendment 4 by seizing on petitioner's contention that the ballot title is too long to be read and comprehended during the time alloted the voter in the voting booth. Of course, this time argument might make more sense if the other foregoing word and ballot title arguments made by petitioner had been seen as problems or deceptions the voter would have confronted when marking his or her ballot. Not so. The majority has narrowed the so-called ballot title confusion to one issue — whether the voter is capable of understanding that "wagering on games of chance or skill" by using "mechanical, electrical, electronic or electromechanical devices and table games" constitutes casino gambling?

The majority actually penalizes the drafters, including the Attorney General, for having the ballot title cover the entire text of the measure. If a part (or parts) of the measure had not been referred to in the ballot title, petitioner would surely have questioned as misleading the title's having omitted that part. All agree, length alone has never been a sufficient reason to invalidate a ballot title. In fact, this court has upheld a challenge to the sufficiency of a ballot title which was about 900 words long. The proposed amendment in *Bailey* involved a complex refunding measure involving bonds. *Bailey* v. *Hall*, 198 Ark. 815, 131 S.W.2d 635 (1939); *see also Newton* v. *Hall*, 196 Ark. 929, 120 S.W.2d 364 (1938) (court upheld ballot title containing 735 words). Here, the ballot title is only 709 words in length, and the text covering proposed Amendment 4 is nowhere close to the complexity found in the measure and ballot title in *Bailey*.

In past decisions, this court has recognized the difficulty in preparing a perfect ballot title, and it has held that a title is suf-

ficient if it informs the voters with such clarity that they can cast their ballot "with a fair understanding" of the issue presented. *Ferstl* v. *McCuen*, 296 Ark. 504, 758 S.W.2d 398 (1988). The court has also held that the Arkansas Attorney General's approval of a ballot title raises a *presumption* as to its sufficiency *and only in a clear case should such an approval be held insufficient. Plugge* v. *McCuen*, 310 Ark. 654, 841 S.W.2d 139 (1992). (Emphasis added).

Here, the Attorney General approved the proposed amendment's ballot title, finding it not confusing or misleading. The Attorney General's decision was not clearly wrong.

It is not the first time that I have concluded, when reviewing ballot title cases, that I have every confidence in the voters of this state to decide the fate of proposed amendments on their merits. *Finn* v. *McCuen*, 303 Ark. 418, 798 S.W.2d 34 (1990) (Glaze, Hays and Dudley, JJ., dissenting); *see also Hasha* v. *City of Fayetteville*, 311 Ark. 460, 845 S.W.2d 500 (1993) (Glaze, Hays and Corbin, JJ., dissenting) (a non-ballot title case, but represents another case where four members of this court found the voters and citizens could not have understood the issue they voted on). More times than not, such proposed measures are controversial and invite partisan charges and counter-charges. However, so long as the voter can have a "fair understanding" of the issue involved, this court should allow the people their constitutional right to vote on the proposed amendment. To do otherwise serves to undermine our democratic form of government.

Like the Attorney General, it is in no way clear to me that the Arkansas people cannot cast an intelligent vote on the merits of Amendment 4. Therefore, I would deny the petitioners request to remove the measure from the General Election ballot.

In conclusion, I would note that the petitioners requested this court to enjoin the Secretary of State from placing this proposal on the 1994 General Election ballot or if the ballot is already prepared, that no votes on the issue be counted. Presumably the Secretary of State has already certified Amendment 4 since absentee ballots will be mailed and voted soon. *See* Ark. Code Ann. 7-5-401—417 (Repl. 1993); *see also* Ark. Code Ann. § 7-9-115(a) (not less than eighteen (18) days before the election, the Secre-

tary of State shall furnish the State Board of Election Commissioners and county boards of election commissioners a certified copy of the ballot title and popular name of each proposed measure). When the Secretary of State certifies the proposed amendment, the county boards of election commissioners are mandated to take cognizance of the proposed amendment. Ark. Code Ann. § 7-9-115(b). To confuse matters, the county boards of election commissioners are not parties to this action and therefore are not before this court so they can be directed not to count ballots that have been duly prepared and voted. It appears to me that the only relief this court can lawfully give petitioners is to issue a mandamus to the Secretary of State, who is a party to this action, to reject canvassing and certifying the returns on Amendment 4. *See* Ark. Code Ann. § 7-9-119(d) (Repl. 1993). The majority opinion effectively grants relief under § 7-9-119(d) without the petitioners having asked for it. Whether petitioners requested such relief does not trouble me, but the fact the county boards are not parties to this action does because without them as parties, they are still statutorily required not only to place the measure on the ballots, but also have the ballots counted, tabulated, canvassed, returned and certified to the Secretary of State. Ark. Code Ann. §§ 7-9-117 and -119 (Repl. 1993).

This problem of being able to grant effective and timely relief to a successful petitioner under Amendment 7 was presented to this court in the *Finn* case, cited above, where this court struck down the General Assembly's efforts to enact a law, Act 280 of 1989, which provided reasonable timetables in dealing with initiative and referendum measures to be placed on the General Election ballots. This court was wrong in *Finn* and problems continue to abound.

HAYS, J., joins this dissent.