REYNOLDS *et al. v.* HALL, SECRETARY OF STATE.

5-231                                                    261 S. W. 2d 405

Opinion delivered October 19, 1953.

*E. M. Arnold,* for plaintiff.

*Tom Gentry,* Attorney General, and *Thorp Thomas,* Assistant Attorney General, for defendant.

*Dean R. Morley, House, Moses & Holmes* and *Owens, Ehrman & McHaney,* for interveners.

*Warner & Warner, Amicus Curiae.*

GRIFFIN SMITH, Chief Justice. In 1953 the 59th general assembly, by Act 285, amended legislation relating to the wholesaler's selling price for liquors. In 1949 a markup of 15 percent of the cost of liquor was authorized by § 3 of Act 282. Section 1 of Act 252, approved March 19, 1951, reënacted the 1949 limitation upon the selling price, but reduced it from 15 to 13 percent. The 59th assembly reënacted the two pertinent sections, but fixed the wholesaler's selling price at cost, plus 10%. Subdivision (b) levied and directed the wholesaler to collect three percent on such liquors, "which shall be in addition to any and all other taxes heretofore or hereafter levied and collected thereon".

The proceeds from such taxes were apportioned 40% to a County Fair Fund established by the Act, 52% to a similarly created State Fair Fund, and eight percent to the District Fair Fund. It will be seen that Act 285 first makes the wholesaler's selling price 10% more than his cost. This markup is in no sense a tax, nor was it so intended. But a tax is imposed on the wholesaler by subdivision (b), and from this tax the allocations of 40%, 52%, and 8% are made.

The levying Act was not an emergency measure. It was, therefore, subject to popular approval or rejection under Amendment No. 7 to our Constitution and this right became absolute if six percent of the legal voters, as defined by the Amendment, petitioned for such referendum not later than 90 days after final adjournment of the legislative session at which the Act was adopted.

Within the time allowed petitions containing 42,255 names were filed. It is not denied that the actual number of petition-signers necessary for referral was 23,495.[1]

This original action came to the court's attention in July of this year when 25 plaintiffs as resident taxpayers sought an order to restrain the secretary of state from certifying the subject-matter of the referendum to commissioners for inclusion on the ballot in the general election in November, 1954. Coupled with the petition was the request that a court commissioner be appointed to take testimony relating to the manner in which signatures were secured. By an order of July 6th this request was denied. Other pleadings were filed, including interventions. The secretary of state demurred, as did some of the interveners.

The complaint contends that the move to refer is selfishly inspired in that wholesalers alone will be affected; that irrespective of language in the Act first permitting a 10% markup and then levying the tax of three percent, the wholesaler's charge to the retailer remained 13% as before and cost to the public would not be affected because of the levy against the wholesaler.

It is then said that the wholesalers' committee as a voluntary group conspired with 640 retailers, the purpose being to have counterpart petitions circulated by retailers under a quota arrangement designed to produce 57,600 signatures. In conformity to this plan printed forms were placed in most of the retail whiskey stores and signatures of customers were solicited by proprietors and their employees. These petitions, it is contended, are an integral of the state's election machinery, therefore the procurement of signatures so set out was illegal and in contravention of public policy.

A further allegation is that wholesale dealers procured the circulation of attractively printed cardboard posters addressed to liquor users. These posters, it is

---

[1] Discrepancies involving about 25 signatures are spoken of, but are not important to this decision. (The certificate of the Secretary of State showed 42,280 signatures instead of 42,255 mentioned above.)

contended, contained false statements knowingly made for the purpose of convincing customers that Act 285 would increase the price of liquors three percent, in violation of subdivision (4), Ark. Stat's, § 2-202.

Finally it is urged that the ballot title was insufficient because its tendency would be to mislead the consumer into believing that the 3% tax would fall on him. A more exact statement may be copied from the brief: "It tells him of a 3% tax but does not tell him that the markup to the wholesale dealer is reduced by the same amount."

The ballot title reads: "An Act prescribing the markup on wholesale prices of alcoholic beverages, levying a tax of 3% on the wholesaler's selling price of alcoholic beverages, and providing for the distribution of revenue from such tax for the construction of buildings and facilities of state, county, and district fairs."

We have concluded that the demurrers of the secretary of state and the several interveners must be sustained. There is no statutory authority for avoiding petitions because signatures were procured by owners of retail liquor stores and their employees. It is true that subdivision (4) of § 2 of Act 195, approved March 11, 1943, (Ark. Stat's, § 2-202) denounces as a misdemeanor the conduct of one who knowingly and falsely misrepresents the purpose and effect of the petition or the measure for the purpose of causing anyone to sign, but the entire trend of legislation and the result of our decisions is to say that rights guaranteed by Amendment No. 7 may be facilitated by legislation, but not impaired or abridged. While on demurrer we must treat well pleaded elements of a complaint as having been admitted, here the legislative authority did not undertake to say that signatures procured through false representations would be ignored. Rather, the penalty is a fine of not less than $50 nor more than $1,000 for each such violation.

The conspiracy charged to wholesale and retail dealers is that by letter the nine wholesalers directed a course of conduct which, if not expressly prohibited by law, is clearly in conflict with public policy. In the letter com-

plained of it was stated that the committee composed of wholesalers had divided the state into six districts, ''as shown by the map [attached]. The chairman of each district is shown. Please contact the wholesale salesman in your district for additional petitions and information. Each petition has space for 30 signatures. Our goal is a minimum of three complete petitions for every package store in Arkansas.'' The tax trend from 1935 to 1943 was referred to, the closing statement being: ''Someone said we can be certain of two things—death and taxes. [We] think our industry can be sure of another—'death *by* taxes' unless we unite to combat this destructive trend today. Good luck!'' Then by way of post script: ''Please be sure to comply with all legal requirements in obtaining signatures.''

We are unable to say that this letter is evidence of a conspiracy in the sense that the term is used in legal channels. There was, of course, coöperation. Financial interest no doubt convinced the actors that united they might stand. But this falls short of stating a situation upon which fraud might be predicated. Nor do we agree with plaintiffs that the poster published an untruth. It was to have been expected that interests threatened with adverse action would state the issue in its most favorable light. Still, the fact remains that Act 285 first reduced the retailers' markup, then authorized a levy of three percent. This amounted to nothing more than compelling the wholesaler to become collector for the state as to this special fund.

We do not wish to be understood as going to the extreme of saying that in no circumstance could the misrepresentation of the circulator of a petition avoid the signature of the person so influenced; but we do hold that where, as here, the measure sought to be referred was printed on the petition forms, there can be scant excuse for a voter saying that he relied upon extraneous representations rather than the textual matter. In the second place, no one in this proceeding claims to have been imposed upon. Instead, the plaintiffs merely insist that because of the plan pursued others were deceived.

A situation somewhat similar was presented to the Supreme Court of Missouri, *State ex rel. Westhues* v. *Sullivan, Secretary of State,* 283 Mo. 546, 224 S. W. 327. It was held that the judicial authority would not inquire into the reasons inducing a person to sign a referendum petition. See *Edwards* v. *Hutchinson, Secretary of State,* 178 Wash. 580, 35 Pac. 2d 90; *In re Initiative Petition No. 142,* 176 Okla. 155, 55 Pac. 2d 455. Somewhat related is *Luck* v. *Magnolia-McNeil Road Improvement District No. 1,* 141 Ark. 603, 217 S. W. 781. In the Luck case it was held that proceedings looking to the formation of the improvement district would not be enjoined on an allegation that signatures to the petition to form the district had been obtained through fraudulent representations. In other road improvement district litigation it has been held that persons claiming to have been misinformed had no right to rely upon the allegedly false statements. *Pharr* v. *Knox,* 145 Ark. 4, 223 S. W. 400. See *Vaught* v. *Frey,* 219 Ark. 525, 243 S. W. 2d 384.

Our conclusions in respect of the ballot title are likewise contrary to contentions of the plaintiffs. Certainly it is not required of one submitting a referendum proposal that all arguments for and against the measure be included in the title. It is sufficient if it fairly states what the Act provides, and this should be done as concisely as is practicable.

The plaintiffs' contentions are rejected and the cause is dismissed.