## Edward DUST et al *v.* Paul RIVIERE, Secretary of State et al

82-173 & 82-190                    638 S.W.2d 663

### Supreme Court of Arkansas
### Opinion delivered September 2, 1982
[Rehearing denied September 27, 1982.]

Coleman, Gantt, Ramsey & Cox, by: *E. Harley Cox;*
*Davidson, Horne, Hollingsworth, Arnold & Grobmyer,* by:
*Walter Davidson; Thomas, Paddock & Llewellyn,* by: *Bill*
*Thompson; Oscar Fendler;* and *Friday, Eldredge & Clark,*
by: *Herschel H. Friday, Frederick S. Ursery* and *Robert S.*
*Shafer,* for petitioners.

*James F. Lane,* for Wells, petitioner-intervenor, appel-
lant.

*Wright, Lindsey & Jennings,* by: *Alston Jennings, J.*
*Mark Davis* and *Edward L. Lowther,* for Reynolds Metal
Company, *amicus curiae* in support of petitioners.

*Rose Law Firm, P.A.,* for Arkansas Poultry Federation,
*amicus curiae* in support of petitioners.

*Steve Clark,* Atty. Gen., by: *David L. Williams,* Deputy
Atty. Gen. and *Mary B. Stallcup,* Asst. Atty. Gen., for
respondent.

*Youngdahl & Larrison,* by: *James E. Youngdahl;* and
*Walter W. Nixon, III,* for Ratepayers Fight Back, respond-
ent-intervenor.

DARRELL HICKMAN, Justice. This is an original action
by the petitioners seeking an injunction to prohibit the
Secretary of State from certifying a proposed constitutional
amendment as valid. John F. Wells, individually, and
Independent Voters of Arkansas, Inc., were allowed to
intervene as petitioners and they raise issues other than the
validity of the ballot title. Ratepayers Fight Back, repre-
sentative of several Arkansas organizations, has been al-
lowed to intervene as respondent. Another lawsuit on this
matter, filed by Wells in the Pulaski Chancery Court, and
before us on appeal, has been consolidated with this case.

The proposed constitutional amendment by its popular
name is "The Arkansas Utility Regulation Amendment"
and has been filed with the Secretary of State as an initiative
petition to amend our present constitution in compliance
with Amendment 7 to the Arkansas Constitution. There are
other issues raised besides the sufficiency and validity of the
ballot title, but it is unnecessary to dwell on those because we

find the ballot title fails to meet the standards required and those issues, therefore, are moot.

The Secretary of State will be enjoined from placing this proposal on the ballot in the 1982 November General Election.

The proposed amendment itself is a comprehensive, technical, lengthy, and detailed document that runs to some 8,500 words. It first provides for the election of Public Service Commissioners who are now selected by appointment. After that simple initial proposal, however, the amendment becomes comprehensive, detailed legislation, dealing with many specific instances of the regulation of certain public utilities. It is a document of flowing general statements of power and policy followed by lengthy detailed expositions that are usually found in the small print of statute books or legal documents. It speaks to various technical practices in the regulation of utilities such as fuel adjustment charges and time-of-day tariffs. It is peppered with references to existing state and federal laws.

The amendment proposes to create a new government entity, the Ratepayers Utility Board, "to promote the health, welfare, and prosperity of all citizens of this state by ensuring effective and democratic representation of individual residential utility consumers, individual farmers, and small business firms before regulatory agencies, the legislature, and other public bodies." This proposed Board will be managed and directed by a Board of Directors consisting of seven people appointed by the executive branch of government. But those appointments are quite limited. The Governor appoints one person from nominees made by "at least three environmental organizations having a statewide membership and from coalitions of such groups . . ." The Lieutenant Governor appoints an individual that is a nominee recommended by organized labor in Arkansas. The Attorney General appoints an individual "from at least three nonprofit consumer organizations having statewide membership . . ." The Auditor's one appointee is nominated "from at least three retirement/elderly organizations having statewide membership . . ." The Treasurer appoints an individual nominated "from at least three organizations of

low-income persons . . ." The Secretary of State's appointee must represent businesses in Arkansas "which sell, distribute or manufacture materials and/or equipment used for, or provide services related to energy conservation purposes or the production of energy through the use of renewal energy resources." The Land Commissioner will appoint one person representing "small retail businesses and small family farms." This information is not in the ballot title.

The Board would be funded through revenues raised by imposing a .4 mill tax or fee on the gross annual revenues of certain utilities — undoubtedly at the expense of all consumers, but that is not explicit. The ballot title does disclose a .4 mill assessment will be made but it does not disclose that the proposed Board will be totally independent of any other branch of government; that the General Assembly shall have no authority at all to legislate regarding the powers, duties or functions of this Board or the expenditure of funds received by the Board. This change of constitutional law is not disclosed. It is not just another government agency or board but it will be a department of government subject only to the control of the board members that are appointed.

We have no quarrel with the general ideas or principles proposed in the amendment; their novelty or uniqueness is irrelevant. The voters of this state essentially have, within constitutional limits, a right to change any law or any provision of our Constitution they deem appropriate through Amendment 7 to the Constitution.

If the voter knows the extent and import of such a proposal, it is the voter's decision, not ours, as to the wisdom of the proposal. But at the same time the voters have placed on this court the duty and responsibility to see that when they vote that change, or decline to vote that change, especially one to alter their constitution, they are allowed to make an intelligent choice, fully aware of the consequences of their vote. And it is our duty to see that the individual voter has available a sufficient ballot title when deciding to accept or reject the amendment. It must permit an intelligent and knowledgeable decision to be made. The legal

question is whether in the voting booth the voter can be able to exercise the decision to vote for or against the proposal based on the ballot title. We have recognized that "The great body of electors, when called to vote for or against an act at the general election, will derive their information about it from the ballot title. This is the purpose of the title." *Hoban v. Hall,* 229 Ark. 416, 316 S.W.2d 185 (1958).

In *Bradley* v. *Hall,* 220 Ark. 925, 251 S.W.2d 470 (1952), we stated:

> It is the function of the ballot title to provide information containing the choice that he is called upon to make. Hence the adequacy of the title is directly related to the degree to which it enlightens the voter with reference to the changes that he is given the opportunity of approving.

The principles we use in deciding whether the ballot title is sufficient and valid are clear. In *Bradley* v. *Hall, supra,* we said:

> Our decisions upon the sufficiency of ballot titles have been so numerous that the governing principles are perfectly familiar. On the one hand, it is not required that the ballot title contain a synopsis of the amendment or statute. *Sturdy* v. *Hall,* 204 Ark. 785, 164 S.W.2d 884. It is sufficient for the title to be complete enough to convey an intelligible idea of the scope and import of the proposed law. *Westbrook* v. *McDonald,* 184 Ark. 740, 43 S.W.2d 356, 44 S.W.2d 331. We have recognized the impossibility of preparing a ballot title that would suit everyone. *Hogan* v. *Hall,* 198 Ark. 681, 130 S.W.2d 716. Yet, on the other hand, the ballot title must be free from 'any misleading tendency, whether of amplification, of omission, or fallacy,' and it must not be tinged with partisan coloring.

Furthermore, we have said that we give a liberal construction to Amendment 7 in determining the sufficiency of the ballot title. *Becker* v. *Riviere,* 270 Ark. 219, 604 S.W.2d 555 (1980).

But that does not mean that liberality knows no bounds or common sense has no place in the matter. While neither the length nor complexity of the ballot title should be a controlling factor, it is a consideration. The great majority of Arkansas voters are limited, as a practical matter, in the amount of time that can be spent considering such a proposal. Furthermore, common sense requires that we ask whether the average voter can make an intelligent considerate decision based on the ballot title. In *Newton* v. *Hall*, 196 Ark. 930, 120 S.W.2d 364 (1938), we noted that the length of the title could be a serious objection because the law recognizes that an elector's time is limited in occupying a voting booth.[1]

We have concluded that the proposed ballot title is so complex, detailed, lengthy, misleading and confusing that the Arkansas voter cannot intelligently make a choice based on the title. The best evidence of that is the ballot title itself. We attach the ballot title as an addendum to this opinion and invite any disinterested person to read it in the time one would ordinarily use in a voting booth, and understand the changes that the amendment proposes. We are convinced only a lawyer or an expert in utility law and regulations might do that. The rest of us would have to guess as to the effect a vote will have, or have faith in the proponents of the amendment. Placing the voter in such a posture is impermissible.

In our view the critical defect of the ballot title is the misleading aspects. The ballot title is certainly misleading regarding the power of the Ratepayers Utility Board. The ballot title says its purpose is to "represent and advocate the interests of residential and small business utility customers" and similar language is contained throughout the act. But the ballot title does not tell the voter the interests of the seven people who will direct that Board and that is an important fact since their interests may not necessarily coincide with those of the majority of the residential and small business customer. The majority of the board members will be chosen from nominees of organizations whose interests may be in

---

[1]The limit of time a person may use to vote in a voting machine is three minutes, Ark. Stat. Ann. § 3-1221 (Repl. 1976); otherwise it is five minutes. Ark. Stat. Ann. § 3-1222 (Repl. 1976).

conflict with those of the majority of the residential and small business customer. Nominees of organized labor, environmental organizations, retirement/elderly organizations and organizations of people with low incomes will constitute a majority of the Board. The voter, who is a residential or small business consumer, has a right to know that these interests can direct and control the Board which is supposed to represent and advocate the interests of residential and small business consumers. Actually, the small business consumer may not even be represented because the Land Commissioner makes only one appointment to represent "small retail business and small family farms."

The fact that the Ratepayers Utility Board will be a new government entity or department subject to no control or check at all by any of the existing branches of government is not disclosed or referred to. The General Assembly is the first arm of government representing the people, and the voter has a right to know when a new entity or department of government is created that will not be subject to existing constitutional controls granted to that body. Indeed, it appears that the Board itself, elected by no one and responsible to no one, will decide how the Board's power will be used and whose interests will be served. In these regards the ballot title does have a tendency to be misleading and is not free from partisan coloring. *See Walton* v. *McDonald,* 192 Ark. 1155, 97 S.W.2d 81 (1936).

No doubt the sponsors of the proposal have made a good faith effort to present a brief, fair and objective ballot title available on this complex, far-reaching amendment. But in our judgment the ballot title does not meet the standards as we have explained.

Injunction granted.

PURTLE and HAYS, JJ., dissent.

## ADDENDUM

*Popular Name.*

"The Arkansas Utility Regulation Amendment"

*Ballot Title.*

An amendment to the Constitution of Arkansas to establish an elected Public Utilities Commission, create a Ratepayers Utility Board, restrict utility collection of rates under bond, regulate long-term utility planning and investment, abolish the use by investor-owned electric utilities of automatic fuel adjustment charges and prohibit all electric utilities from implementing mandatory time-of-day rates by:

Providing for statewide election of three public utilities commissioners beginning at the general election of 1984; establishing commissioner salaries, terms and conditions of service; providing that the Governor, on or after January 14, 1983, appoint three commissioners to serve until the first elected commissioners take office; exempting the Commission and its staff from executive branch hiring freezes and from state laws governing employee classification and compensation systems and requiring the Commission to establish its own such system; restricting employment and financial dealings between utilities and commissioners or Commission employees; and requiring monthly disclosure of campaign contributions of $50.00 or more;

Creating a non-profit corporation to be known as the "Ratepayers Utility Board" (RUB) to represent and advocate the interests of residential and small business utility customers before the Commission and other governmental bodies; requiring constitutional officers of the Executive Department to appoint from designated constituencies directors of the RUB; providing that the RUB be funded through the direct assessment of a .4 mill ($.004) on the gross annual revenues of every utility regulated by the Commission; authorizing the RUB to communicate with utility customers through the monthly billing statements of utilities; establishing the powers and duties of the RUB; and establishing conflict of interest restrictions for RUB officials;

Prohibiting utilities from collecting rates under bond, except in specified emergenies or if the Commission has

failed to rule on a rate application within 12 months; providing that in no case may the utility collect two sets of rates under bond simultaneously and that in any case the Commission shall determine the rates to be collected under bond; requiring that all rates found unlawful be refunded with interest; and allowing for direct appeal of Commission orders to the Arkansas Supreme Court, provided that the Court may not suspend rates allowed or refunds ordered by the Commission.

Requiring electric, gas, and telephone utilities to file annually with the Commission ten-year plans for meeting demands for utility services; requiring regular Commission hearings to determine actions utilities shall take to implement the lowest-cost plans; empowering the Commission to order the utility to delay, cease, or redirect investments not in the best interests of the utility and its customers and to reduce the rate of return allowed the utility if the Commission finds the utility made imprudent investments; limiting the inclusion of construction work in progress expenditures in an investor-owned utility's rate base; requiring the Commission to establish a division of forecasting and planning; requiring Commission approval before utilities may pass through to ratepayers any costs of power plants situated outside Arkansas with which an Arkansas utility is associated; requiring Commission approval before an electric utility may sell, transfer or dedicate any interest in major generating facilities; and requiring the Commission to stay its final decision on any application to build a major generating facility, if such application was pending on or filed within two years after the effective date of this Amendment, until the Commission has issued an order on the utility's ten-year plan;

Prohibiting the use by investor-owned electric utilities of an automatic adjustment to rates for fuel and purchased power expenses; providing that the Commission may not adjust such expenses more frequently than one every six months, except on an emergency basis; prohibiting the use of estimted fuel and purchased power expenses in setting rates; prohibiting the recovery from ratepayers of fuel

and/or purchased power expenses which result from the failure of major generating facilities to achieve reasonable operating efficiency standards which shall be set by the Commission; and prohibiting the use of mandatory time-of-day tariffs by electric utilities;

Providing that the provisions of this Amendment are severable, that this Amendment repeals all other laws in conflict with it, that the General Assembly shall make appropriations required for the effectuation of this Amendment, that the General Assembly by a two-thirds vote of both houses may amend specified provisions of this Amendment; and for other purposes.

STEELE HAYS, Justice, dissenting. I believe the ballot title is sufficient and I would deny the injunction. The proponents have obtained the requisite number of signatures (assuming their validity) within the time limits set by law. The popular name and ballot title are notably free of slanted phrasing or partisan coloring. True, the proposed amendment is long and complex and every detail is not covered, but there is no indication the ballot title does not fairly and adequately inform the voter of the scope and import of the proposal. It should be approved.

The two deficiencies of the ballot title cited by the majority are, one, its length and, two, its failure to fully inform the voters concerning the composition of the Ratepayers Utility Board (RUB). The proposal itself is long, perhaps too long, but nowhere do I find precedent for the view that length alone can be so crucial as to put the proposal in jeopardy of the courts, as opposed to the voters. I disagree that *Newton* v. *Hall*, 196 Ark. 930, 120 S.W.2d 364 (1968) can be read as holding the length of the ballot title poses "a serious objection." The challenge there was to the *brevity* of the ballot title, not its length, and we upheld it in that case even though it was longer than this one (735 words against 707). Justice Frank G. Smith, author of *Newton* v. *Hall*, observed that the length of the ballot title "like this opinion," rather than its brevity, was the more serious question, noting that a voter could not read many such

ballot titles in the 5 minutes allowed him in the voting booth. But that casual language, rendered in a lighter vein, should hardly be treated as a precedent for the proposition that length itself can render a ballot title defective. Justice Smith's words were not even dictum, but merely a polemic response to an appellant who was arguing that the ballot title was incomplete.

The troubling thing about the majority opinion is an inability to settle on whether the ballot title is too long or too short. In one breath, it suggests the voters cannot intelligently consider a ballot title of such length in the 3 minutes allowed by Ark. Stat. Ann. § 3-1221 (Repl. 1976) for voting machine occupancy, at the same time finding it fatally defective because it omits essential details about the Rate-payers Utility Board. But we have told the public again and again that the ballot title need not be exhaustive or elaborate and, indeed, should not be. In *Coleman* v. *Sherrill,* 189 Ark. 843, 75 S.W.2d 248 and *Walton* v. *McDonald,* 192 Ark. 1155, 97 S.W.2d 81 (1936), we said:

> "It may be observed that if the ballot title were intended to be so elaborate as to set forth all the details of the act, the publication or advertisement might, for that very obvious reason, be omitted. Perhaps, no set rule or formula can be announced as to what a ballot title shall contain, but it may be safely stated that, if it shall identify the proposed act and shall fairly allege *the general purposes* thereof, it is sufficient." (My italics.)

In *Reynolds* v. *Hall,* 222 Ark. 478, 261 S.W.2d 405, we upheld the ballot title saying a ballot title need not contain a synopsis of the act nor even explain to the voter that a tax is imposed by the proposal. In *Newton* v. *Hall,* supra, language of Chief Justice McSherry was cited with approval:

> "It never has been understood that the title of a statute should disclose the details embodied in the Act. It is intended simply to indicate the subject to which the statute relates.  . . . When the general subject is indicated no matters of detail need be mentioned in the title." (See *Baltimore* v. *Stewart,* 92 Md. 535, 48 Atl. 165).

By this opinion we are abandoning the mandate of our cases that Amendment 7 be given a liberal construction in determining the sufficiency of the ballot title in favor of a narrow interpretation. *Becker* v. *Riviere,* 270 Ark. 219, 604 S.W.2d 555 (1980). The likely consequence is that sponsors of future proposals will be discouraged in the attempt and, hence, this useful part of our political system weakened. How will proponents of future proposals know which details we will select as essential to the ballot title when we have said repeatedly the only requirements are that it shall be complete enough to convey an intelligible idea of the scope and import of the proposal and free of partisanship and any misleading tendency, whether of amplification, or omission, or fallacy? *Bradley* v. *Hall,* 220 Ark. 925, 251 S.W.2d 470 (1952). Our cases can be interpreted as holding that mere omissions from the ballot title are not fatal, so long as they are not misleading or deceptive. The majority concedes the good faith of the sponsors of this proposal yet denies them access to the ballot notwithstanding the prior approval of the ballot title by the Attorney General, who made changes of his own. We have held his approval to be significant and worthy of added consideration. When that occurs we will deny the proposal a place on the ballot only where the deficiencies are obvious. *Mason* v. *Jernigan,* 260 Ark. 385, 540 S.W.2d 851 (1976) and *Fletcher* v. *Bryant,* 243 Ark. 872, 422 S.W.2d 698 (1968).

I cannot find this ballot title to be clearly deficient simply because of its length or because of the absence of every detail respecting the selection of the Ratepayers Utility Board. Our system contemplates that the elective process itself will provide a vital part of the political dialogue by which the voter becomes informed on ballot issues and by which he comes to a decision as to how he will vote. The right to change laws under Amendment 7 procedures belongs to him and we ought to be reluctant indeed to deprive him of it. When we deny, on slender grounds, the electorate the right to pass on Amendment 7 proposals, however dubious we might be of the proposal, we do a disservice to a fundamental concept of self-government.

PURTLE, J., joins in this dissent.