Mr. Oscar Stilley Attorney at Law 7103 Racetrack Loop Fort Smith, AR 72916
Dear Mr. Stilley:
You have requested certification, pursuant to A.C.A. § 7-9-107, of the popular name and ballot title for a proposed amendment to the Arkansas Constitution. You have previously submitted ballot titles for various similar measures. See Ark. Ops. Att'y Gen. Nos. 2003-348, 2001-391, 2001-211, 2001-210, 2000-020, 1999-416, 99-261, 99-200 and 97-333. Your proposed popular name and ballot title are as follows:
 Popular Name AN AMENDMENT REQUIRING VOTER APPROVAL FOR TAX INCREASES, ABOLISHING MINIMUM MILLAGE REQUIREMENTS, AND PHASING OUT ARKANSAS INCOME TAXES
 Ballot Title AN AMENDMENT TO THE ARKANSAS CONSTITUTION PROVIDING THAT THE STATE AND ALL LOCAL ENTITIES MUST HAVE VOTER APPROVAL IN ADVANCE FOR ANY NEW TAX RATE INCREASE, MILL LEVY ABOVE THAT FOR THE PRIOR YEAR, VALUATION FOR ASSESSMENT RATIO INCREASE FOR A PROPERTY CLASS, EXTENSION OF AN EXPIRING TAX, OR A TAX POLICY CHANGE DIRECTLY CAUSING A NET TAX REVENUE GAIN TO THE STATE OR ANY TAXING ENTITY; PROVIDING THAT NOTHING IN THIS AMENDMENT SHALL BE CONSTRUED TO PERMIT THE IMPAIRMENT OF THE SECURITY OF HOLDERS OF ANY BONDS LAWFULLY SECURED BY SALES TAXES OR AD VALOREM PROPERTY TAXES; ABOLISHING AND PROHIBITING ALL MINIMUM MILLAGE REQUIREMENTS WITHIN THIS STATE, OR REQUIREMENTS TO MAINTAIN ANY PARTICULAR LEVEL OF EDUCATION FUNDING, DERIVED FROM ANY ARKANSAS STATUTE OR CONSTITUTIONAL PROVISION, OR ANY INTERPRETATION THEREOF; REQUIRING THE STATE TO DISTRIBUTE FUNDS FOR PRIMARY AND SECONDARY EDUCATION EQUALLY ON A PER PUPIL BASIS, WITH RESPECT TO ALL STUDENTS OF A GIVEN AGE GROUP, EXCEPT AS OTHERWISE REQUIRED BY LAW SUPERIOR TO THIS CONSTITUTION, AND EXCEPT THAT THE GENERAL ASSEMBLY MAY DECLINE TO PROVIDE ALL OR PART OF THE FUNDING FOR STUDENTS IN CIRCUMSTANCES IN WHICH THE GENERAL ASSEMBLY FINDS THAT THE STUDENTS ARE NOT LEGAL RESIDENTS OF THE UNITED STATES, OR WHERE THE GENERAL ASSEMBLY FINDS THAT THERE IS INADEQUATE EVIDENCE THAT SAID STUDENTS ARE RECEIVING AN ADEQUATE ACADEMIC EDUCATION; AUTHORIZING THE USE OF THE INITIATIVE PROCESS TO PROPOSE INCREASES OR DECREASES IN SCHOOL DISTRICT MILLAGE RATES, UPON THE SIGNATURES OF TEN PERCENT (10%) OF THE WHOLE NUMBER OF ELECTORS CASTING BALLOTS IN THE MOST RECENT SCHOOL ELECTION; ABOLISHING AND PROHIBITING THE TAXES UPON PERSONAL AND CORPORATE INCOMES NOW LEVIED BY THE STATE OF ARKANSAS ARE HEREBY ABOLISHED AND PROHIBITED; (THIS MAY CAUSE THE STATE TO HAVE LESS MONEY FOR PROGRAMS AND SERVICES THAN WOULD OTHERWISE BE THE CASE); PROVIDING THAT THE INCOME TAX SHALL BE PHASED OUT BY ALLOWING THE STATE FOR THE TAXABLE YEAR 2007, AND ALL SUBSEQUENT YEARS, TO COLLECT AND RETAIN STATE INCOME TAXES WHICH TOGETHER WITH STATE SALES AND USE TAXES WILL GENERATE NET REVENUE EQUAL TO THE NET REVENUE FROM INCOME TAXES AND STATE SALES AND USE TAXES COLLECTED FOR THE YEAR 2006 (HEREINAFTER SOMETIMES BASE YEAR REVENUE); PROVIDING THAT FOR THE TAXABLE YEAR 2007 AND ALL SUBSEQUENT YEARS, ANY STATE INCOME TAX REVENUES NOT REQUIRED TO PROVIDE THE STATE OF ARKANSAS WITH ANNUAL REVENUES EQUAL TO BASE YEAR REVENUE SHALL BE DIVIDED AMONG AND REFUNDED TO ALL PERSONAL AND CORPORATE INCOME TAX PAYERS IN THE STATE OF ARKANSAS, PRO RATA ACCORDING TO THEIR RESPECTIVE TAX PAYMENTS; PROVIDING THAT ALL CALCULATIONS OF INCOME TAX RECEIPTS SHALL BE BASED UPON MONEY ACTUALLY COLLECTED IN THE CALENDAR YEAR FOLLOWING THE TAXABLE YEAR, AND REFUNDS SHALL BE MADE ONLY TO PERSONS WHO ACTUALLY PAID TAXES DURING THAT YEAR; PROVIDING THAT AFTER THE LAST YEAR IN WHICH INCOME TAX IS NECESSARY TO SUPPLY THE STATE WITH REVENUE EQUAL TO THE NET REVENUE FROM INCOME TAXES AND STATE SALES AND USE TAXES FOR THE YEAR 2006, THE STATE INCOME TAX, ON PERSONAL OR CORPORATE INCOMES, SHALL BE FOREVER PROHIBITED UNLESS AND UNTIL REAUTHORIZED BY AMENDMENT TO THIS CONSTITUTION; PROVIDING THAT FOR PURPOSES OF THIS AMENDMENT, THE TERM "STATE SALES AND USE TAX" SHALL NOT INCLUDE SALES AND USE TAX EARMARKED EXCLUSIVELY FOR COUNTY AND MUNICIPAL GOVERNMENTS; PROVIDING THAT IN CASE CERTAIN GOODS OR SERVICES ARE EXEMPTED FROM SALES AND USE TAX, AFTER THE DATE OF THIS AMENDMENT, THE PHASE OUT OF THE INCOME TAX SHALL BE CALCULATED AND IMPLEMENTED AS IF SUCH SALES AND USE TAX EXEMPTION HAD NOT BEEN GRANTED; PROVIDING THAT IF THE RATE OF THE STATE SALES AND USE TAX IS REDUCED, THE PHASE-OUT OF THE INCOME TAX SHALL BE CALCULATED AND IMPLEMENTED AS IF THE RATE OF THE STATE SALES AND USE TAX HAD NOT BEEN REDUCED; PROVIDING THAT IF THE STATE SALES AND USE TAX RATE IS INCREASED, THE PHASEOUT SHALL BE CALCULATED INCLUDING THE ADDITIONAL REVENUE AS STATE SALES AND USE TAX REVENUES, UNLESS OTHERWISE SPECIFICALLY AUTHORIZED BY THE PEOPLE AT A GENERAL ELECTION; PROVIDING FOR LIBERAL CONSTRUCTION IN FAVOR OF THE TAXPAYER, SEVERABILITY, AND GENERAL REPEALER OF CONFLICTING AMENDMENTS; PROVIDING THAT THIS AMENDMENT IS SELF-EXECUTING AND WILL TAKE EFFECT THE FIRST DAY OF THE YEAR FOLLOWING VOTER APPROVAL; REQUIRING THE GENERAL ASSEMBLY, AND ANY AND ALL STATE OR LOCAL RULE MAKING AUTHORITIES, TO MAKE ALL OTHER AND FURTHER LAWS AND REGULATIONS NECESSARY TO THE ENFORCEMENT OF THIS CONSTITUTIONAL AMENDMENT, IN FULL COMPLIANCE WITH THE UNITED STATES CONSTITUTION; AND FOR OTHER PURPOSES
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition.
A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. Consequently, this review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certification is to ensure that the popular name and ballot title honestly, intelligibly, and fairly set forth the purpose of the proposed amendment or act. See Arkansas Women's PoliticalCaucus v. Riviere, 282 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device. Pafford v.Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v. Bryant, 259 Ark. 294, 532 S.W.2d 741
(1976); Moore v. Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall, 229 Ark. 416, 417, 316 S.W.2d 185
(1958); Becker v. Riviere, 270 Ark. 219, 223, 226, 604 S.W.2d 555
(1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen, 318 Ark. 277, 285,884 S.W.2d 938 (1994), citing Finn v. McCuen, 303 Ark. 418, 798 S.W.2d 34
(1990); Gaines v. McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988); Hoban v.Hall, supra; and Walton v. McDonald, 192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. §7-5-522's five minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring. Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law. Christian CivicAction Committee v. McCuen, 318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial. Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citing Leigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
Having analyzed your proposed amendment, as well as your proposed popular name and ballot title under the above precepts, it is my conclusion that I must reject your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. A number of additions or changes to your ballot title are, in my view, necessary in order to more fully and correctly summarize your proposal. I cannot, however, at this time, fairly or completely summarize the effect of your proposed measure to the electorate in a popular name or ballot title without the resolution of the ambiguities. I am therefore unable to substitute and certify a more suitable and correct popular name and ballot title pursuant to A.C.A. § 7-9-107(b).
Before addressing the specific ambiguities in the text of your proposed amendment, I will note for your guidance that I am troubled by the length of your proposed ballot title, which contains 753 words. The longest ballot title ever approved by the Arkansas Supreme Court contained 994 words, which summarized the substance of the voter-initiated Tobacco Settlement Proceeds Act. Walker v. Priest, 342 Ark. 410, 29 S.W.3d 657
(2000). However, in approving this ballot title, the court stressed that its substance had already been widely publicized. Id. at 420. The court further stated that the ballot title at issue "staked out the outer limits for length and complexity." Id. at 426. In this regard, I should note that the court has in the past stricken as too lengthy and complicated ballot titles shorter than the one you have currently submitted. See, e.g., Scott v. Priest, 326 Ark. 328, 932 S.W.2d 746
(1996) (550 word title not invalid on length alone, but this factor plus serious omissions defeated title); Christian Civic Action Committee v.McCuen, supra [318 Ark. 241, 884 S.W.2d 605 (1994)] (709 word title struck down with length as a major factor when viewed in light of other defects); and Dust v. Riviere, 277 Ark. 1, 638 S.W.2d 663 (1982) (727 word title invalid as too lengthy, complex, misleading and confusing).
In response to previous submissions, I have advised you on various occasions that the length of your proposed ballot titles was a cause for concern. See, e.g. Ark. Ops. Att'y Gen. Nos. 2001-391, 2001-211 and 99-263. I appreciate that the length of your ballot title in part reflects the complexity of your proposed amendment, which addresses a variety of issues. However, as I have done before, I must warn you of the particular hazards attendant to the ballot title of a lengthy and complex proposal such as yours. The ballot title for such a measure must avoid both the danger of being too lengthy and the danger of having serious omissions. More specifically, the title cannot be so lengthy as to cause voters to violate the voting booth time limitations, yet it must not omit any of the proposed measure's important factors. For this reason, I must point out that with any proposed amendment of considerable length and complexity such as yours, the sponsor runs the risk of a challenge and of a finding by the court that the ballot title is unacceptable, either because it is too "complex, detailed, and lengthy," or because it has "serious omissions." See, e.g., Page v. McCuen, 318 Ark. 342,884 S.W.2d 951 (1994). See also, Walker v. Priest, supra. This concern may be increased where the measure covers more than one subject matter area.Id. at 425 (upholding the "CHART" tobacco settlement act ballot title, but stating that ". . . here again, as was the case in Newton, [Newtonv. Hall, 196 Ark. 929, 120 S.W.2d 364 (1938)] `we have an amendment which deals only with [a] single question,' Newton, 196 Ark. at 948, which helps confirm our confidence in our voters' ability to understand this ballot title.")
In my opinion, the numerous ambiguities in the text of your proposed amendment may be a function of its complexity. Among these ambiguities are the following:
1. Section 1(A) of your proposed amendment provides:
 Henceforth, the state and all local taxing entities must have voter approval in advance for any new tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to the state or any taxing entity.
It is unclear what you mean by the term "local taxing entities." Do you intend to include in this term an assessing entity like an improvement district, as you have attempted to do before — see, e.g., Ark. Op. Att'y Gen. No. 2001-391 — or do you mean to use the term more narrowly? If we merely repeat your term in the ballot title, the voters might be confused as to its scope.
It is further unclear what you mean by "valuation for assessment ratio increase for a property class" — a coinage that appears nowhere in the Code or the case law. It may be that you mean to require voter approval of any increase in the ratio of assessed value to appraised value for purposes of taxation, which currently stands at 20%. However, I cannot tell enough from your use of this cryptic term to summarize your proposal for the voters.
This subsection is further confusing in that it suggests that taxing authorities will in all cases be able to determine when a "tax policy change" will directly cause "a net tax revenue gain to the state or any taxing unit." Your proposed amendment contains no guidance of any sort regarding who is going to make this determination, how it is to be made and how or when it is to be referred to the voters.
The proposed proscription against the adoption of any "tax policy change directly causing a net tax revenue gain to the state or any taxing entity" suggests that your proposed amendment might be intended to preclude the imposition of any new taxes without voter approval. However, the catalog of taxes recited in section 1(A) quoted above suggests that your concern is only to avoid any increase or extension of existing taxes without voter approval. It is consequently unclear precisely what limitations upon the power of taxation you intend to impose. The voters might consequently be misled by a ballot title summary of this section.
2. Section 1(B) of your proposed amendment provides:
 Nothing in this amendment shall be construed to permit the impairment of the security of holders of any bonds lawfully secured by sales taxes or ad valorem property taxes.
In Ark. Op. Att'y Gen. No. 2003-348, which addressed your most recent previous submission, I offered the following criticism of a similar provision:
Your proposed measure contains provisions that purport to protect the interests of the holders of bonds that are secured by tax proceeds. However, the measure does not indicate the specific procedure by which such bondholders' interests are to be protected.
This criticism applies equally to the provision quoted above. The specific procedures to be adopted in order to ensure that the bondholders' interests are protected may be of a nature that might give voters "serious ground for reflection," thus triggering a requirement of disclosure in the ballot title under the standard set forth in Bailey,318 Ark. at 285.
3. Section 2 of your proposed amendment provides:
 All minimum millage requirements within this state, or requirements to maintain any particular level of education funding, derived from any Arkansas statute or constitutional provision, or any interpretation thereof, are hereby abolished and prohibited. The State shall distribute funds for primary and secondary education equally on a per pupil basis, with respect to all students of a given age group, except as otherwise required by law superior to this constitution, and except that the General Assembly may decline to provide all or part of the funding for students in circumstances in which the General Assembly finds that the students are not legal residents of the United States, or where the General Assembly finds that there is inadequate evidence that said students are receiving an adequate academic education. The people are hereby authorized to initiate increases or decreases in school district millage rates, by the initiative process, upon the signatures of ten percent (10%) of the whole number of electors casting ballots in the most recent school election.
With respect to the provision of this section mandating state funding of primary and secondary education "equally on a per pupil basis" for "all students of a given age group," as I noted in Opinion No. 2003-348 in addressing a similar provision:
It is unclear whether the reference to "age group" is intended to be interpreted literally, or whether it is intended to refer instead to grade levels. This ambiguity could be problematic, given the fact that all pupils in a particular grade level are not of the same age group.
Your current submission has not been edited to address this criticism. In light of this ambiguity, I cannot summarize your proposal.
This section is further ambiguous in providing that "the people" may increase or decrease millage rates "by the initiative process" upon obtaining signatures equaling 10% of the" electors casting ballots in the most recent school election." Although it is not entirely clear, I gather that your reference to "the people" is to the electors of any given school district, not to the electors of the whole state. However, you fail to specify the procedures whereby the referenced "initiative process" will proceed. Although Ark. Const. amend. 7 sets forth the mechanisms for proposing and voting on statewide, municipal and county initiatives, Amendment 7 does not apply to school district elections. While you may intend the General Assembly to define the initiative procedures, this is likewise unclear, particularly in light of your suggestion in section 4 that the terms of your proposed amendment will "to the extent possible be self-executing." Accordingly, without further textual guidance, I am unable to summarize this provision in a ballot title.
Perhaps more fundamentally, I consider it confusing that section 2 of your proposed amendment would abolish without elaboration "[a]ll minimum millage requirements within this state, or requirements to maintain any particular level of education funding." It is unclear whether you mean by this provision (a) to absolve school districts of any obligation to levy any local millage in support of the public schools, including the uniform rate of tax; and/or (b) to absolve the state of what is currently its constitutionally mandated obligation to maintain a "general, suitable and efficient system of free public schools," as mandated by Ark. Const. art. 14, § 1. Read literally, the language quoted above would appear to repeal by implication the education article of the constitution and Ark. Const. amend. 74, whereby the electors imposed the 25-mill uniform rate of tax to support maintenance and operation of the schools. The voters may well have "serious ground for reflection" regarding this provision, and I cannot adequately summarize its substance without clarification.
This section is further confusing in that it would absolve the state of any obligation to provide funding for education" where the General Assembly finds that there is inadequate evidence that said students are receiving an adequate academic education." This provision raises various questions. Just what is "inadequate evidence"? Is it the same as" adequate evidence that said students are not receiving an adequate academic education"? Are the students themselves or the districts obliged to provide "evidence" that students "are receiving an adequate academic education" and, if so, to whom is this "evidence" to be presented? Moreover, are you actually proposing that, rather than redoubling its efforts to salvage a district that provides an inadequate education, the General Assembly might simply cut off all of an inadequate district's funding — and further, that it might do so with no assurance that local funds would fill the gap? If so, your proposal would almost certainly offend the principle of equal protection articulated as follows by the United States Supreme Court in Plyler v. Doe, 457 U.S. 202, 230 (1982):
If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest.
As drafted, section 2 is unclear as to whether it would purport to authorize the General Assembly arbitrarily to cut funding for an underperforming district, in apparent derogation of the federal equal protection doctrine discussed above, or whether you propose to address this problem in some other way, such as by administrative consolidation or annexation of an underperforming district. Without clarification, I cannot summarize this provision.
Furthermore, I believe the provision of section 2 of your proposed amendment authorizing the General Assembly to" decline to provide all or part of the funding for students in circumstances in which the General Assembly finds that the students are not legal residents of the United States" likewise offends the equal protection clause of the United States Constitution. Indeed, in Plyler, supra, the Court expressly held that a statute denying a generally available free public education to illegal immigrant children violated the equal protection clause.457 U.S. at 230. If you are indeed proposing a state constitutional amendment that directly flouts this directive of federal law, it will be necessary to note as much in any ballot title certified for you measure, since any such conflict might certainly give a voter "serious ground for reflection."
Finally, if you intend to repeal any current state constitutional provisions, the repeal should be expressly stated in your proposed measure, allowing me to summarize that important fact for the voters in a ballot title.
4. Section 3 of your proposed amendment, captioned "PHASE OUT OF STATE INCOME TAX ON PERSONAL AND CORPORATE INCOMES," provides in pertinent part:
 (A) The taxes upon personal and corporate incomes now levied by the State of Arkansas are hereby abolished and prohibited. Nevertheless, the State may for the taxable year 2007, and all subsequent years, collect and retain state income taxes which together with state sales and use taxes will generate net revenue equal to the net revenue from income taxes and state sales and use taxes collected for the year 2006 (hereinafter sometimes base year revenue).
This section provides that for each year beginning with "taxable year 2007," the state may collect whatever amount of income tax, in combination with state sales and use taxes collected, will equal but not exceed the sum total of revenues collected from these categories of taxation for the year 2006. This formula directly contradicts the first sentence of the passage just quoted. It further contradicts subsection 3(B), which provides:
 After the last year in which income tax is necessary to supply the state with revenue equal to the net revenue from income taxes and state sales and use taxes for the year 2006, the state income tax, on personal or corporate incomes, shall be forever prohibited unless and until reauthorized by amendment to this constitution.
The provision in subsection 3(A) authorizing the state in" all subsequent years" to impose an income tax at a level that, in conjunction with sales and use tax revenues, will match base-year revenues is inconsistent with the provision in subsection 3(B) mandating that state income tax be "forever prohibited" from the first year in which no income tax is needed to match base-year revenues. The only way one could attempt to reconcile these two subsections would be to assume conclusively that once sales and use tax revenues match 2006 base-year revenues, they will continue to do so forever. This assumption is unwarranted.
You further fail altogether to address the logistical complexities of implementing your proposal — a failure that raises a variety of questions. Under the scheme set forth in your proposed amendment, must the state in any given year project both the widely variable amount of state sales and use tax collections and the widely variable amount of individual and corporate income in order to determine what rates of income taxation will realize revenues, when added to sales and use tax revenues, sufficient to match base-year revenues? If so, your proposed amendment neither indicates as much nor offers any indication as to who is going to undertake this monumental task and how. Alternatively, must the state wait to determine income tax rates until it has tallied sales and use tax receipts for any given year? If so, what implications does this have for the assessment and collection of income taxes? Again alternatively, assuming the voters adopt your proposed amendment, would the rate of income taxation for tax year 2007 be the same as for tax year 2006, subject to the proviso set forth in subsection 3(A)(1) that any over-collection of income tax be refunded pro-rata? If so, by what mechanism would these refunds be calculated and how would they be made? Furthermore, assuming sales and use tax revenues in one year matched base-year revenues but failed to do so in the next year, would income be subject to taxation in the second year? If so, how and when would that tax be imposed and collected? Particularly in light of your suggestion in section 4 that your proposed amendment will be largely self-executing, it is far from clear that you intend the legislature independently to address these thorny questions. I am consequently unable to summarize the effect of your measure to the electorate.
5. Subsection 3(C) of your proposed amendment provides:
 For purposes of this amendment, the term "state sales and use tax" shall not include sales and use tax earmarked exclusively for county and municipal governments. If any particular class of goods or services is exempted from sales and use tax, after the date of this amendment, whether by the General Assembly or by the initiative process, the phase out of the income tax shall be calculated and implemented as if such sales and use tax exemption had not been granted. If the rate of the state sales and use tax is reduced, the phase-out of the income tax shall be calculated and implemented as if the rate of the state sales and use tax had not been reduced. If the state sales and use tax rate is increased the phaseout shall be calculated including the additional revenue as state sales and use tax revenues, unless otherwise specifically authorized by approval of a majority of the qualified electors voting on the issue at a regularly scheduled statewide election.
This subsection is ambiguous in various respects. With respect to the first sentence, it is unclear whether you mean the phrase "sales and use tax earmarked exclusively for county and municipal government" to refer to local sales and use taxes or whether you mean the term to refer to state sales and use taxes dedicated to fund municipal governments.
The remainder of this subsection is apparently calculated to effect the "phase-out" of income taxes as quickly as possible, based on the dual fictions (1) that goods or services exempted from sales or use taxation have, in fact, been taxed and (2) that any reduction in sales or use taxation has, in fact, not occurred. In my opinion, it might well constitute a "serious ground for reflection" for a voter that these two startling and counterintuitive provisions significantly qualify the formulas set forth elsewhere in section 3, insofar as the abolition of income tax might occur significantly earlier than it otherwise would have with no provision for supplementing tax revenues from another source. This possibility is not directly acknowledged in your measure and I am consequently unable to summarize it for the voters.
6. Subsection 3(D) of your proposed amendment provides:
 Nothing herein shall be construed to authorize the increase of any of the rates of the individual and corporate income taxes in the State of Arkansas, above those existing on the effective date of this amendment, regardless of the amount of actual or projected tax collections in any given year. Nothing herein shall be construed to limit the amount of sales and use tax which may be collected by the State of Arkansas.
This subsection is confusing in that it wrongly appears to assume that a constitutional provision would be necessary to "authorize" the legislature to impose a tax increase. It is generally held as a canon of state constitutional construction that a state constitution is not a grant of enumerated powers to a state general assembly, but is rather a limitation on the power of a general assembly to act. See, e.g., Wellsv. Purcell, 267 Ark. 456, 592 S.W.2d 100 (1979); Jones v. Mears,256 Ark. 825, 510 S.W.2d 857 (1974); and Berry v. Gordon, 237 Ark. 547,376 S.W.2d 279 (1964). That is, the legislature has absolute power to legislate in all fields unless it is expressly or by necessary implication denied that power by the Constitution. Id. It is thus confusing to suggest that a constitutional amendment could "authorize" the legislature to do anything.
Applying this rule of state constitutional construction, I cannot determine precisely what limitation you mean to impose in declaring that "[n]othing herein shall be construed to authorize the increase of any of the rates of the individual and corporate income taxes . . . above those existing on the effective date of this amendment. . . ." It is unclear whether this clause is intended absolutely to bar any increase of income tax rates above the recited levels. If the proposed amendment is read in isolation, this absolute bar clearly appears to apply, since the proposed amendment addresses the entire category of state income taxes and declares in subsection 3(D) that "[n]othing herein" shall be construed as allowing an increase in those taxes above the rates in effect on the effective date of the amendment. However, implicit in the term "nothing herein" is a suggestion that some other provision of current state law might "authorize" an increase in the rate of income taxation above the rates in effect on the effective date of your proposed amendment. Given the absolute priority of a just passed constitutional amendment over any conflicting provision of state law, I cannot summarize this illogical suggestion in a ballot title.
Moreover, even if subsection 3(D) could be read as unequivocal in capping income tax rates at those in effect on the effective date of your proposed amendment, I still could not summarize this provision without generating confusion in the voters regarding the provision's relationship to other terms of your submission. As I noted in my discussion in section 4, supra, the dual provisions in subsection 3(A) first abolishing income taxation and then "authorizing" the legislature to collect income taxes subject to the recited restrictions are flatly contradictory in that they impose differing limitations on the state's taxing power. Indeed, as drafted, your proposed amendment imposes four varying limitations on the state's power to tax income:
(1) The first sentence of subsection 3(A) flatly abolishes income taxation.
(2) The second sentence of subsection 3(A) permits income taxation in perpetuity at rates sufficient to create revenues that, when added to sales and use tax revenues in any given year, will match base-year revenues.
(3) Subsection 3(B) abolishes income taxation forever from the first year in which no income tax revenues are needed to supplement sales and use tax revenues in order to match base-year revenues.
(4) Ignoring, for the moment, the above discussed confusion relating to the use of the term "[n]othing herein" in subsection 3(D), regardless of how meager sales and use tax revenues might be in any given year, subsection 3(D) prohibits imposing income tax rates that exceed those in effect as of the effective date of your proposed amendment.
Without belaboring the analysis, I will note that the first of these four restrictions necessarily conflicts with each of the other three; the second would conflict with the third if sales and use tax revenues matched base-year revenues in one year and then failed to do so in a subsequent year; and the fourth would conflict with the second if income tax rates in any given year would need to exceed the rates in effect on the effective date of your proposed amendment in order to realize revenues that matched base-year revenues when added to sales and use tax revenues. I would be unable to summarize these conflicting provisions in a ballot title without confusing the voters.
7. Section 4 of your proposed amendment provides in pertinent part:
 The provisions of this amendment shall to the extent possible be self-executing and shall take effect on the first day of the year after approval by the voters, except as otherwise herein provided. The General Assembly, and any and all state or local rule making authorities, shall be required to make all other and further laws and regulations necessary to the enforcement of the Constitutional Amendment. . . .
In Opinion No. 2003-348, I offered the following analysis in addressing a materially indistinguishable provision contained in your most recent previous submission on this topic:
 This language is manifestly unclear. The measure gives no guidance whatsoever as to how to determine the extent to which self-execution is possible, or who is to make that determination. No individual or entity, nor any legislative or rule-making body who would be affected by this provision will be in a position to determine whether, when, or the extent to which the measure will be in effect on January 1, 2005, or whether, instead, further legislation will be required. Moreover, it is unclear how this measure could be enforced.
I believe this analysis applies as well to your current submission.
The foregoing discussion of potential problems in the text of your proposed measure is not intended to be exhaustive. However, the ambiguities and uncertainties discussed above preclude me from performing my job of adequately summarizing your proposed amendment. I am reluctant to interject my own interpretation of your measure on these points into a ballot title or popular name given my uncertainty as to the precise underlying assumptions. These questions must be addressed in your measure and ballot title.
My office, in the certification of ballot titles and popular names, does not concern itself with the merits, philosophy, or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied only in A.C.A. § 7-9-107
and my duty is to the electorate. I am not your counsel in this matter and cannot advise you as to the substance of your proposal.
At the same time, however, the Arkansas Supreme Court, through its decisions, has placed a practical duty on the Attorney General, in exercising his statutory duty, to include language in a ballot title about the effects of a proposed measure on current law. See, e.g., Finnv. McCuen, 303 Ark. 418, 793 S.W.2d 34 (1990). Furthermore, the Court has confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v. Priest,341 Ark. 813, 20 S.W.3d 376 (2000). The Court concluded: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to confusion in the ballot title itself." Id.
Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure and ballot title. See A.C.A. §7-9-107(c). In this regard, in undertaking this "redesign," I strongly urge you to heed the criticisms I have offered above — advice you have failed to heed in previous resubmissions, as illustrated by my copious references to identical, yet unaddressed criticisms made in earlier opinions issued to you by this office.
You may, after clarification of the matters discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. I anticipate, as noted above, that some changes or additions to your submitted ballot title may be necessary. I will be pleased to perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
MIKE BEEBE Attorney General
MB/cyh